**DIXIE GAS & FUEL CO. v. JACOBS et al.**

No. 2203.

Court of Civil Appeals of Texas. Beaumont.

March 18, 1932.

Rehearing Denied March 23, 1932.

A. M. Huffman and Smith, Smith & Boyd, all of Beaumont, for appellant.

D. E. O'Fiel, O. M. Lord, and W. R. Blain, all of Beaumont, for appellees.

WALKER, J.

This was an action by appellee Luberta Jacobs, joined by her husband, Phil Jacobs, against appellant, Dixie Gas & Fuel Company, for damages for personal injuries. Upon trial to a jury judgment was rendered in favor of appellees for the sum of $8,000.

Appellees alleged that on Christmas night, December 25, 1930, while driving south on Center street in Beaumont, at the north intersection line with Gladys street, they drove their car into a wide and deep hole executed by appellant which it had negligently left uncovered and unguarded, resulting in serious and permanent injuries to Luberta. The answer of appellant consisted of general and special demurrers, general denial, and pleas of contributory negligence.

On motion for new trial appellant contended that the judgment was against the great weight and preponderance of the evidence, and by proof made by affidavits that it was procured by perjured testimony. We believe these allegations should have been sustained and a new trial granted.

Appellees are negroes. On the trial of this case Luberta was carried to court in an ambulance and taken from the ambulance and into the courtroom and into the presence of the jury on a rolling adjustable hospital or surgeon's cot by four attending negroes and gave her testimony while lying on the cot. She testified that she was injured about 6 o'clock p. m. on the 25th day of December, 1930, in the manner pleaded; that it was dark when she received the injury; that she was twenty-four years old at the time of the trial, and before she was injured was in good health and had never been hurt or injured in any way before that time; as a result of her injuries she was rendered unconscious and did not know when the car was taken out of the hole nor when she was taken to her home, and did not regain consciousness until the next day; that she had been confined to her bed at all times from the date of her injury until the date of the trial and had not been up at all because she was unable to stand up or to sit up; that Martha Gray, a negro woman, did her work and nursed her from the date of her injuries to the date of the trial. On cross-examination she refused the request of appellant to be weighed and to be examined by doctors. She testified further that on Christmas Day she worked for Mrs. J. W. Bettersworth in Caldwood. In substance, the testimony of her husband, Phil Jacobs, was the same as that of his wife; that is, that she had been confined to her bed since her injuries, and that she had not been up at all.

On motion for new trial, appellant, by affidavits of the witnesses, showed the following facts:

(a) Mrs. J. W. Bettersworth wrote out and made affidavit to the following facts: In August, 1930, she employed Luberta to do her housework; on Christmas Day, while Luberta was doing her work, Phil went to Mrs. Bettersworth's kitchen and she heard quite an argument between Phil and his

wife; after Phil left Luberta told her he was trying to get some money with which to buy whisky; the next day, that is, the day after Christmas, Luberta returned to her work and told Mrs. Bettersworth that they had a wreck, turned their car over, and that Phil was drinking; Luberta worked all the week after Christmas for Mrs. Bettersworth doing the usual housework, washing, ironing, and cooking; Luberta did not return to her work the day after New Year's Day, and the next day Phil went out to Mrs. Bettersworth's home and told her that Luberta was sick, but gave no details, and Mrs. Bettersworth did not learn of the filing of this lawsuit until about two months later; after Phil reported that Luberta was sick he went out to Mrs. Bettersworth's each week for the washing and would report that Luberta would be able to return to her work "in about three weeks"; after about four months she told Phil that she had waited on Luberta about four months, and, if she wanted her job, she would have to come back to work; within a few days after this message was sent to Luberta, she and Phil went over one night to see Mrs. Bettersworth, at which time Luberta told her about her injuries and suffering, but said she was able to return to her work and could have come back in three weeks; the second day after this visit Luberta returned to her work and cooked lunch for several days; after doing her work for several days at the regular hours she asked permission to cook lunch in the morning, then return home, and come back to her work and cook the evening meal, to which Mrs. Bettersworth consented; in this connection she told Mrs. Bettersworth that "it would only be necessary for her to work that way until after her case came up in court"; later she told Mrs. Bettersworth that the case was to be tried on the 18th of May and that she would not come to work that day; she did not come to work on the 18th and did not return to her work until May 21st, when she came in the afternoon and cleaned up the house and did some cooking; Thursday of the following week after the trial she came back to work, working as she had before, coming early in the morning, fixing lunch, etc.; "during the first days of June a Mr. Huffman come to my house one morning when Luberta was cleaning house and inquired of her about her health and how her case came out;" one day after the trial, while Luberta was working for Mrs. Bettersworth, Mrs. Bettersworth, on returning home from her work down town, was told that Luberta had left the house in the morning after telephoning to some one in Lake Charles; that she said she was taken suddenly sick.

(b) J. W. Bettersworth made affidavit that he knew Luberta and had known her for about a year; she worked for him and his wife during the latter half of 1930 and part of 1931; she worked during the month of January as cook and housekeeper and worked on and off at various periods until two or three weeks before the date of the affidavit, which was on the 1st of July, 1931, when she was discharged; he knew when her damage suit was tried in district court and that she worked for his family prior to that time and up to the date of the trial and came back to work soon after the trial and worked until the date of her discharge; during all the time she worked for his family during 1931 she seemed to be in as good health and as good physical condition as during 1930; in 1931 when her husband failed to come for her at the end of the day's work she walked to her home; on several occasions she reported that it was necessary for her to walk from her home to her work; during the time she worked for his family after December 25, 1930, she did the cooking and housecleaning, being the same kind of work done during 1930.

(c) Maxwell Huffman made affidavit that on the 30th of May, 1931, Mr. Charles D. Smith of the law firm of Smith, Smith, Huffman & Boyd, invited him to his office and asked him to interview Mrs. J. W. Bettersworth with regard to her knowledge of the whereabouts of Luberta Jacobs before, during, and immediately after the trial of Luberta's lawsuit; he agreed to do this and reported his conversation with Mrs. Bettersworth to Mr. Smith; within a few days after that time he spoke to Luberta in Mrs. Bettersworth's home and asked her how she was and how her case was coming on, and suggested that she should be careful or "she might get herself into trouble"; he tried to induce Luberta to make a statement disclosing the truth of her case; he asked Luberta what she meant by allowing herself to be carried into the courtroom on a rolling stretcher after having worked at Mrs. Bettersworth's house previous and up to the trial, and she said that she did not want to be bothered about the case any more, that all she wanted to do was to be allowed to work; that she had always worked and intended to do so as long as she lived. He asked Luberta what she was doing across the street when the ambulance arrived at her house to take her to court, to which she replied she was not across the street, that she might have been in the woods in front of the house, but she was not across the street, "then catching herself and trying to correct this answer she said that there was no one that saw her anyway"; she said that she had not told anything but the truth.

(d) Mr. P. B. Doty, president of the First National Bank of Beaumont, and Mr. C. R. Wyatt, vice president and general manager of A. W. Fabra Auto Supply Company, made affidavit that they were personally acquaint-

ed with Maxwell C. Huffman, and that he was a young man of high standing and reputation and of unblemished character and sound integrity and a man of strict honor and veracity. Mr. Alfred Jones, editor of Beaumont Enterprise, and W. W. Watson, advertising director of Beaumont Enterprise, made a similar affidavit regarding J. W. Bettersworth.

(e) John Pugh made affidavit that he worked out at Caldwood as caretaker during the spring of the year 1931; that he had known Luberta Jacobs for about one year and secured the job for her with Mrs. Bettersworth; during the spring of 1931, while working in Caldwood Addition, he saw Luberta Jacobs on several occasions going to her work with Mrs. Bettersworth; she would be riding in a Ford touring car with her husband; he had occasion to go to Mrs. Bettersworth's at one time during the spring of the year for the purpose of seeing Phil Jacobs to collect some money; "I knocked on the back door and Luberta Jacobs came to the door and opened it and I told her that I wanted to see Phil"; he did not see Luberta doing anything "except standing around in the kitchen backdoor." She did not appear to be sick. "To the best of my recollection it was during the latter part of April that I saw Luberta Jacobs, as above stated."

(f) Ida Dibrell made affidavit that she knew Phil Jacobs and Luberta Jacobs; they rented and lived in a house belonging to her and her husband; "just next door but one from the house we lived in"; she knew that Luberta claimed to have been hurt on Christmas night; "but I do know she went to her work the next day just like she always did," but she did not remember how long Luberta worked before she quit; she did not hear anything about Luberta being hurt "till she got back home in bed after she quit work and when I heard it I dropped in to see her and talked to her about how come she went to work the very next day after she was hurt"; sometime in April Luberta bought some new furniture; the next day after the furniture was delivered "Luberta went back to work, alleged she was working, and she kept on going back every day, leastways she would go and come every day and she said she was working; she kept this up, going and coming to her work every day until they moved out of my house to somewhere else; she would go away early in the morning and come back early after dinner, somewhere along about three o'clock; when they moved Luberta went over to the new place with her husband on the first load in the truck." As for Luberta being sick, she did not look sick to the witness; "she was fat and healthy looking and acted like she was well and didn't act like no sick person to me;" "Luberta put out a family washing the day before she moved from my house."

(g) Minnie Slater made affidavit that she was thirty-two years old; a widow and school teacher, and resided in Beaumont; that she knew Luberta Jacobs and Phil Jacobs. Her house was three doors from the house where Luberta lived until Luberta moved, in April; that they lived in that house during the Christmas holidays and up until they left in April; she saw Luberta and her husband frequently and had considerable contact with them; she did not hear of Luberta's injuries until something like a week or ten days after Christmas; she was surprised to hear such a thing because Luberta had been going to and from her work all along from Christmas up until "I was told this, and I couldn't understand how she could have been hurt as she claimed and still work every day"; she did not visit Luberta after that because she felt there was something wrong about the sickness, that it was fake, or pretended; she and Luberta used water from a common hydrant beyond Luberta's place from the place of the witness; the witness knew Martha Grant, Luberta's nurse; "I saw Martha wearing a nurse's apron or dress as if she was a nurse, and doing nurses' work and I was surprised at that. I was then more convinced than ever that it was a frameup and that Luberta was faking an injury, more especially when they kept everything secret from us after she went to staying in;" some days before Luberta moved to another house she did her family washing and put out the washing in the yard early one morning; the witness saw her do this; at that time Luberta was going to and from her work; the witness did not know anything about Luberta having filed a suit or anything about that; "they seemed to keep all that from us, her neighbors."

First. In view of the foregoing affidavits, the following conflicts between the testimony of Phil and his wife and of their principal witness, Marshall Jones, become material. On the trial Phil testified that he took Luberta to work Christmas morning and returned to his home and stayed there all day until about 1:30. In a deposition given by Luberta a few days before the trial she testified that Phil carried her to her work Christmas morning and stayed all day with her in Mrs. Bettersworth's kitchen where she worked out in Caldwood.

Second. Phil testified on the trial that on Christmas night he and Luberta had a Christmas supper at their home at which Marshall Jones and Marshall's wife and little daughter were their guests; he testified that he did not eat Christmas supper that day at Marshall's house, but at his own house; he testified in detail about Marshall and his wife coming to his house, when and how they left, and that he and Luberta carried them home, and the condition in which they found the street. Luberta testified that she and her husband

460

had Christmas supper at Marshall's house and were Christmas guests of Marshall and his wife. She testified as to what they had for supper. Marshall testified that he did not eat supper at Phil's and Luberta's house; that he had not been to their house on that day, but that they ate supper with him.

Third. Phil testified that when his car went into the hole the left front wheel in the hole swung clear; it was not jammed, but free to spin on the axle, and that the right front wheel was cocked up in the air so that it too swung free of the ground and it swung upon its axle also, as did the left front wheel in the hole; while Marshall testified that the left front wheel was in the hole tightly jammed and could not be spun; that he knew it was jammed because they tried it; they tried to crank it.

Fourth. Phil testified that he went to Marshall's house, after driving his car into the hole, and that he got at Marshall's house a 2x6 cypress scantling 6 feet long with which to prize the car out of the hole. Marshall testified that he said to Phil, " 'What's the hole doing in the middle of the street,' he says 'well come on and help me as quick as you can, have you got something heavy,' I says 'yes I have got a 4x4 16 ft. long.' "

Fifth. Phil testified that when the car went into the hole and Luberta struck the windshield she fell back upon the steering wheel and did not say a word and could not walk or stand or sit. In a deposition taken prior to the trial Phil testified:

"Q. It did not damage the car except for the windshield? A. Just the windshield and when she fell up in the windshield like that I stopped the car and I grabbed her and asked her, said 'what's the matter,' and she said 'I don't know, I believe I am hurt,' so I picked her up out of the car.

"Q. What did she say to you when you asked if she was hurt? A. She said 'I believe I have done hurt myself,' and I picked her up and put her on the sidewalk."

On this issue Phil testified further that when the left wheel of his car plunged into the hole, and Luberta was injured, he got out of the car, and the first and only thing he did was to take Luberta out of the car, in his arms; that she was unable to walk or speak; that he carried her in his arms, wading through the water in the street and in the ditch, and laid her down over on the sidewalk; he said that there were a couple of planks there making a sort of bridge in the water and mud, and that he left her there in the wet and cold and went back to Marshall's house to get Marshall to help him. Though the accident occurred in a thickly settled neighborhood, he called no one to help him, but left his wife unconscious on the sidewalk and went to call Marshall Jones. Marshall testified that when he got to the car Luberta

was in the car, lying up against the steering wheel, and that he, with Phil's help, took her out and laid her on the sidewalk. He testified: "When I got there I says 'what's the matter' and no one answered, and I says 'Phil, your wife is hurt.' * * * I told him 'let's take your wife out of the car as quick as we can and see what's the matter,' and we carried her and put her on the sidewalk."

Sixth. Phil testified that, when he reached Marshall's house, Marshall was sitting down in his house by the heater, and that the door was open, and that his wife and child were with him, and that he knocked on the door and Marshall asked who it was, and that Marshall said "What's the matter?" and that he answered "I done fell in a hole out there in the street and I come to get you to help me get the car out of the hole." In this conversation he said nothing about Luberta being injured. On this issue Marshall testified:

"Q. How long had they been gone from your house when he came back for you? A. About three or four minutes, it wasn't nowhere from home.

"Q. What were you doing when he came there? A. Fixing to go lay down.

"Q. Where were you? A. I was by the heater.

"Q. Fixing to go to bed? A. Yes sir, had on my night slippers.

"Q. Was the door closed? A. Yes sir it was closed that night, cool that night.

"Q. You say the door was closed? A. Yes sir."

Seventh. Luberta's depositions above referred to were taken about a week before the trial. On the trial she testified that she was not any sicker at the time of the trial than when her depositions were taken; "I'm just the same sick." On the trial she could not remember that her depositions had been taken. She couldn't remember that the lawyers had been to her house to take her depositions. In her depositions she testified that Dr. Bailey was called to see her the night she was hurt; that he was "the only medical doctor that has been treating me since I have been sick. * * * I didn't have no other kind of doctor, just Dr. Bailey. * * * That's the only doctor I have ever had since I have been in Beaumont, since I got hurt."

Eighth. Phil testified that he bought and paid for medicine, not saying how much, and that he then owed $9.75 for medicine bought for Luberta; he located the drug store to whom he owed this sum as being on the Voth road on the south side of the fairground, about two blocks from Judge's garage. Phil's testimony definitely identified the drug store as being owned by a Mr. McDaniel. Mr. McDaniel, being called as a witness, testified that he never filled any prescriptions by Dr.

Bailey for Phil's wife, that he never sold Phil any liniment, and that Phil never owed him anything. Phil then changed his testimony and identified Mr. Hearn's drug store, ten blocks or so down the road from the place where he had located Mr. McDaniel's drugstore. Mr. Hearn testified that, though he had an account of $9.75 against Phil, the account was closed on January 3, 1931; that the only medicine on the account was a bottle of vegetable compound at $1.25; that he did not fill prescriptions; that the vegetable compound was all the medicine that he remembered selling Phil; that Phil's wife was present when he sold him this medicine.

Appellees answered appellant's affidavits, filed on motion for new trial, by a counter affidavit from Luberta denying everything material in Mrs. Bettersworth's and Mr. Huffman's affidavits. They also filed an affidavit from Martha Grant, the nurse, to the effect that she was in constant attendance upon Luberta from the date of the injury up to the trial. Will Minter made affidavit that he was janitor in the Goodhue building and was at one time an ambulance driver; that he knew Phil and Luberta and on the 8th of April, 1931, drove Luberta in his ambulance to the Mitchell clinic on Calder avenue; that he helped carry her from her bed to the ambulance cot; that she was unable to roll over or turn over or sit up or walk; that they had to pick her up bodily and place her on the cot. Earl Johnson made affidavit that he had been working for Beaumont Cotton Compress for four years and was at one time an ambulance driver; that he was acquainted with Phil and Luberta, and on the 19th of May he went to the home of Luberta for the purpose of carrying her in an ambulance to the courthouse; he helped lift her out of the bed and place her in an ambulance cot beside her bed for the reason she was not able to walk. J. C. Hays testified that he knew Phil Jacobs and Luberta Jacobs and had known them for about seven years; that he and his wife lived in Phil's house; he moved there the day after Christmas and stayed there until April 1, 1931; while they stayed there his wife cooked and helped around the house and helped to nurse Luberta Jacobs at night while Martha Grant nursed her in the daytime; he was there every day and knew that Luberta was not able to get out of bed or even turn in the bed. T. E. Kelly made affidavit that he was acquainted with Phil Jacobs and Luberta Jacobs; that he visited their home "near Concord the first part of January, 1931"; at that time he found Luberta Jacobs in bed, she appeared to be a very sick woman; at various times up until the case was tried he visited her home and each time found her in bed and her condition did not seem to improve; Phil and his wife did not know on any of these occasions that the witness

was going to visit their home. Dixon Ford testified that she was an undertaker; that she had lived in Beaumont for eight years; that she was personally acquainted with Phil and his wife; that she visited their house on the 8th of April, 1931, and carried Luberta in her ambulance from her home to the Mitchell clinic; that it was impossible for her to get up or sit up and she had to be moved from her bed to the ambulance. Will Grant, husband of Martha Grant, made affidavit that he was acquainted with Phil Jacobs and his wife; that he visited the home of Phil and Luberta on several occasions and every time found Luberta in bed. In their affidavits Mr. Huffman and Mrs. Bettersworth referred to several material allegations in Luberta's affidavit and denied them positively, asserting that all her conflicting allegations were false.

### Opinion.

■ As already stated, we believe a new trial should have been granted in this case on the ground that the verdict was unsupported by credible testimony, and, further, that it reasonably appeared, on motion for new trial, that the verdict of the jury was influenced by perjury. Luberta secured a verdict from the jury in the very substantial sum of $8,000 on testimony by her and her witnesses that she was totally incapacitated and had been confined to her bed at all times from the date of her injury to the date of the trial. In rendering this judgment the jury had to reconcile many conflicts and improbabilities in the evidence. For instance, though she was in a dangerous condition, and she and her husband were able to employ a nurse to wait upon her at $2 per day, on their own testimony she received but little medical attention. In her deposition taken a few days before the trial she testified that only Dr. Bailey treated her and Dr. Bailey testified that he saw her only twice. Though she was suffering constantly from her injuries, she and her husband could not testify with any certainty as to the medicine they used. They first testified to buying medicine from a Mr. McDaniels. When his testimony completely answered this contention, they changed their testimony and said they purchased their medicine from a Mr. Hearn and owed him for medicine, up to the trial, $9.75, and produced in court a bill from Mr. Hearn for $9.75. Mr. Hearn testified denying that he had ever sold them any medicine except one bottle of tonic at $1.25, and that Luberta was present when this medicine was bought, and that the balance of the bill was for groceries. Then Phil testified that he left his wife lying unconscious on a narrow plank sidewalk in mud and water and went to Marshall Jones' house for aid and did not ask any of the people who lived at the place of the accident to help him. Without discussing them in detail, we

refer to the other conflicts and inconsistencies reflected by the statement made above. These conflicts in the testimony of appellees are of a nature to challenge seriously the verdict in their behalf. But appellees' testimony could have been false in all of its conflicts and inconsistencies, and yet, if, in fact, Luberta was injured as she claimed and as she appeared before the jury, the verdict would have had support. The fact of injury and its extent was the real question before the jury, and in this connection it should be said that the medical testimony on the trial of the case and on the motion for new trial established the fact, with reasonable probability, that Luberta had suffered an injury or more or less serious consequences. Upon the evidence introduced on the original trial, notwithstanding its questionable character, we would not disturb the verdict of the jury.

But when the trial evidence is weighed in the light of the testimony offered by appellant on motion for new trial, we think the issue of perjury was so clearly raised against appellees that the verdict should have been set aside. If any weight is to be attached to the testimony of Mr. and Mrs. Bettersworth and Mr. Huffman and the negro friends and associates of Luberta, then Luberta was not injured as she claimed, nor confined to her bed constantly from the date of her alleged injury to the date of the trial of this case, but she worked for a week after her injury and a week before the trial and for several days after the trial, and also in March or April after she claimed to be injured she did her own washing.

We have given careful consideration to these affidavits and to the circumstances under which they were made. Mr. Huffman was vouched for by Mr. Doty, president of the First National Bank, and Mr. C. R. Wyatt of A. W. Fabra Auto Supply Company, as a man of honor, integrity, and truthfulness, as was also Mr. Bettersworth by two other witnesses. There is not a suggestion of personal interest in the case on the part of Mr. and Mrs. Bettersworth. It is our conclusion that, when the testimony of appellees is weighed in the light of its inherent weakness and the strong probability of the truthfulness of the testimony of Mr. and Mrs. Bettersworth and Mr. Huffman and of the negro friends of Luberta, who corroborated the white witnesses, the verdict of the jury should be set aside as being without support in credible testimony and as being so against the great weight and preponderance of the credible testimony as to be clearly wrong.

[2] In reaching this conclusion we have not overlooked appellees' proposition that appellant was wanting in diligence in the preparation of its defense. We think a sufficient answer to this is to say that, having confined herself in bed for four months previous to the trial, Luberta should not now be permitted to say that appellant was guilty of negligence in failing to discover her fraud.

■ But we think this case presents an issue more important than mere diligence on the part of appellant. The evidence clearly raised the issue, and sustained it to the extent of a reasonable probability, that appellees influenced the jury in their behalf by willful and premeditated perjury. The courts cannot be made vehicles of fraud, and, when the attempt is made, the wrong should be righted whenever and however, within their jurisdiction, the fraudulent conduct of litigants is called to their attention. This case is so tainted with the odor of perjury that, regardless of diligence on the part of appellant, the issues involved herein should be again sent to the jury.

It would not be fair to counsel for appellees to conclude our discussion of this proposition without saying that we find nothing in the record reflecting upon their integrity. On oral argument they presented the issues of this case with entire frankness, and, though the fact is not reflected by the record, they stated to the court that Luberta is now under indictment for perjury, based upon her testimony given in this case. As a part of the record on motion for new trial, counsel for appellees, in support of their judgment, filed their affidavits to the effect that, when they visited Luberta in her home from time to time in their efforts to prepare the case for trial, they always found her in bed, seemingly in the same condition as she was in the courtroom during the trial. Though these affidavits were not filed for that purpose, they showed that counsel did not know that Luberta was faking illness.

On another trial, the charge on measure of damages should be so framed as to eliminate the double recovery complained of by appellant. Also, the X-ray pictures should be identified more satisfactorily. Appellant should be given more latitude in its effort to impeach Phil Jacobs and Marshall Jones. The other propositions of reversible error are without merit.

For the reasons stated the judgment of the lower court is reversed, and the cause remanded for a new trial.

## On Rehearing.

We have carefully reviewed appellees' motion for rehearing filed in this case, and appellant's answer thereto. The assignments of error made by appellant, referred to in our original opinion, except in so far as they attack the judgment of the lower court as being against the great weight and preponderance of the evidence, were referred to by us merely as directions to the lower court upon another trial. We did not intend, by our original opinion, to hold that these other assignments constituted reversible error, because, in view

of the disposition we are making of the case, this conclusion was not necessary to a disposition of the appeal, and we now say that the judgment of the lower court in this case is reversed, and the cause remanded solely upon the ground that the judgment in appellees' favor is so against the great weight and preponderance of the evidence as to be without credible support.

For the reasons stated the motion for rehearing is overruled.