**WARRANTECH CORPORATION and Warrantech Consumer Products Services, Inc., Appellants,**

v.

**COMPUTER ADAPTERS SERVICES, INC. d/b/a Computer Accessories Services, Lou Braun, and Victoria Clyde, Appellees.**

No. 2–03–002–CV.

Court of Appeals of Texas,
Fort Worth.

April 8, 2004.

Haynes and Boone, L.L.P., Patrick D. Keating, Charles G. Orr, Heather D. Bailey, Dallas, for Appellant.

Cramb & Marling, L.L.P., G. Stanley Cramb, Bedford, for Appellee.

Panel A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

## OPINION

JOHN CAYCE, Chief Justice.

### I. Introduction

Warrantech Corporation (Warrantech) and Warrantech Consumer Products Services, Inc. (WCPS) (collectively, the Warrantech Parties) appeal from the trial court's judgment in favor of Computer Adapters Services, Inc. d/b/a Computer Accessories Services (CAS), Lou Braun, and Victoria Clyde. The primary issue we must decide is whether the trial court abused its discretion by excluding, based on the attorney-client privilege, a letter from Clyde to her attorney that showed

some of Clyde's trial testimony to be false. Because we conclude that the trial court did not abuse its discretion by excluding the letter and that the ruling, even if erroneous, would not have caused the rendition of an improper judgment, and because the Warrantech Parties do not prevail on their remaining appellate issues, we will affirm.

## II. Background Facts and Procedural History

Warrantech provides service contracts to businesses that sell computers and related equipment. Pursuant to these contracts, product purchasers may obtain warranty services in the event they encounter problems with the products. Warrantech provides its service contract services via Warrantech Help Desk, Inc./WCPS.[1] Thus, if a customer has a problem with a computer and calls the number provided on the service contract, the customer will reach WCPS. WCPS attempts to diagnose and solve the problem over the phone, but if that proves unsuccessful, WCPS refers the customer to a repair company, which performs repair services on the computer and bills WCPS for the work. During the time when most of the events relevant to this case occurred, WCPS used hundreds of repair companies.

Braun and Clyde are husband and wife. From April through August 1997, Braun, and occasionally Clyde, performed consulting work for Warrantech on a contract basis. In 1997, Warrantech hired Braun as a full-time employee, as Vice President of Operations for WCPS. Braun and Clyde were living in Michigan at the time, but they moved to Texas so Braun could take the job. Clyde continued to do contract work as a consultant for Warrantech in its claims department. From August 1997 through early 1998, Warrantech paid Clyde's consulting fees to a company she had formed while still in Michigan. Sometime in 1998, however, Clyde began billing Warrantech for her time through the contracting company that Warrantech used. Clyde took the contract position only temporarily, until she could find something else to do.

Braun was employed as Vice President of Operations for WCPS from August 1997 until August 1998. In that capacity, Braun became intimately familiar with, among other things, how WCPS selected repair companies to use for the services it provided and how WCPS processed repair companies' claims for payment. Braun also played a role in selecting which companies WCPS chose to use as repair service providers. In addition, Braun became aware of Warrantech's conflict of interest policy, which provided that no Warrantech employee could have an interest in a competitor or supplier without Warrantech's approval.[2] He also learned, however, that several Warrantech employees, including WCPS's president, Judy Thomas, owned

---

1. While the underlying case was pending, Warrantech Help Desk, Inc., a Warrantech subsidiary, merged with WCPS, and the parties stipulated that WCPS would be liable for any indebtedness that Help Desk owed CAS. Therefore, Help Desk is not a party to this appeal. For simplicity, we refer to Help Desk and WCPS collectively as WCPS.

2. The conflict of interest policy provided:
 No employee of the Company shall engage in the same or a similar line of business or research as that carried on by the Company. An employee shall not have a financial interest in a company which is a competitor of or supplier to the Company without full disclosure and approval. Financial interests held by immediate family members in such companies are to be disclosed to the Company so that a determination can be made as to whether a conflict exists. Members of the employee's immediate family include spouse, children, and any other relative sharing the same home as the employee.

companies "on the side" that did work for Warrantech and that Warrantech employees moonlighted as employees of service providers that performed service repairs for Warrantech.

In her contract consultant capacity in WCPS's claims department, Clyde also became intimately familiar with how WCPS processed and paid service providers' requests for payment for both parts and labor. She continued, however, to look for something else to do on a part-time basis. She had inherited some money that she wanted to invest in opening a business, but while she worked for Warrantech, those plans "went on hold."

In May 1998, Warrantech hired Mato Dill as WCPS's Vice President of Services. Braun and Dill knew each other because, in the 1980s, they had both worked for a company known as Highland Super Stores. Braun also knew Judy Thomas from his days as a Highland employee. Thomas assigned Dill some of Braun's responsibilities, such as selecting which companies WCPS would use as repair service providers.

On August 13, 1998, Warrantech laid off Braun and terminated Clyde's consulting contract. That same day, Braun signed a severance agreement that contained confidentiality and noncompete provisions, for which he was paid $22,500. The agreement provided that, for the three-month period ending November 18, 1998, Braun would not own, operate, direct, invest in, or accept managerial employment from any entity that (1) competed with Warrantech or (2) solicited any of Warrantech's customers.

Sometime between August 14 and August 18, 1998, CAS was formed and began soliciting WCPS's computer repair business. Clyde was CAS's owner and president. She testified that starting CAS was solely her idea, formed the day after she and Braun were laid off from Warrantech. There is other evidence, however, that Braun, Clyde, Dill, and a Warrantech employee named James Schupbach had begun as early as June 1998 to discuss starting a company like CAS.

Throughout most of CAS's relationship with WCPS, Clyde, Braun, and some of CAS's employees attempted to conceal CAS's identity. For example, as we discuss in greater detail in section IV, CAS's employees used aliases in their communications with WCPS. In addition, WCPS required potential repair companies to fill out a service provider questionnaire that provided information about the repair company, including its responsible party or officer. The service provider questionnaire that CAS submitted to WCPS listed Kevin Wichers, Braun's son-in-law, as CAS's responsible party or officer and gave his address as being in Hurst, Texas. Wichers lived in Michigan, however, and he had no actual involvement in CAS's operations. Clyde or Braun had merely discussed with Wichers the possibility of him eventually managing one of CAS's branches, and Wichers had authorized the use of his name on service provider applications.

In late August 1998, WCPS approved CAS as a service repair provider and began sending CAS work. At that time, Dill was still actively involved, as WCPS's Vice President of Services, in selecting its repair service providers. He instructed WCPS employees to send CAS repair business. During the next few months, CAS submitted, and WCPS paid, $360,000 worth of invoices for repair services and parts. CAS also submitted $213,000 worth of other invoices for repair work and parts that WCPS did not pay.

Consequently, CAS sued the Warrantech Parties for breach of contract, quan-

tum meruit, and fraud, alleging that the Warrantech Parties had not paid for many of the repair services CAS had rendered and that it was the Warrantech Parties' common practice to defraud repair service providers by issuing repair orders for services that were not, or might not be, under warranty and then refusing to pay for them. The Warrantech Parties countersued CAS and named Braun and Clyde as third-party defendants, asserting claims for breach of contract, fraud, conspiracy, and breach of fiduciary duty. The Warrantech Parties alleged that appellees had fraudulently induced them to enter into a service provider agreement with CAS by providing false information on their service provider questionnaire; had conspired with Dill to defraud the Warrantech Parties by using information Braun and Clyde had obtained during their employment with Warrantech to form CAS and then submit bills to WCPS for repair services that had never been performed; and had bribed Dill and other Warrantech employees to send CAS business by paying them "kick-backs." The Warrantech Parties further alleged that CAS had breached the service provider agreement by padding its bills and that Braun had breached his severance agreement with Warrantech.

After a jury trial, the jury returned a 10–2 verdict for CAS on its breach of contract and quantum meruit claims, against CAS on its fraud claim, and against the Warrantech Parties on all of their claims against CAS, Braun, and Clyde. The trial court rendered judgment on the verdict and denied the Warrantech Parties' postverdict and postjudgment motions. This appeal followed.

3. Apart from this issue, the Warrantech Parties do not challenge any of the jury's findings

### III. Issues on Appeal

In five issues, the Warrantech Parties complain:

●The trial court reversibly erred by excluding from evidence defendant's exhibit 982 (DX 982), which included a letter from Clyde to her attorney in which she admitted CAS had used fake names when communicating with WCPS.

●The trial court improperly admitted prejudicial and inaccurate character evidence of Warrantech's allegedly fraudulent behavior against entities not involved in this case.

●The trial court erroneously denied the Warrantech Parties a new trial because some of Clyde's trial testimony demonstrated that CAS had committed discovery abuse that prejudiced the Warrantech Parties.

●The evidence is legally and factually insufficient to support the jury's finding that Braun and Clyde fulfilled their fiduciary duties to WCPS.[3]

●The judgment should be reformed to reflect a lower postjudgment interest rate enacted while this appeal was pending.

### IV. Trial Court's Evidentiary Rulings

In their first and second issues, the Warrantech Parties assert that the trial court reversibly erred by excluding part of DX 982, a letter from Clyde to her attorney that directly contradicted her trial testimony about appellees' use of fake names in their contacts with WCPS, and by admitting "bad character" evidence against Warrantech. The Warrantech Parties contend that, because the trial turned on the parties' credibility, these erroneous evidentiary rulings probably caused the ren-

on any of the parties' claims.

dition of an improper judgment and therefore warrant a new trial. *See* Tex.R.App. P. 44.1(a)(1).

▮▮▮ A trial court's rulings admitting or excluding evidence are reviewable under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000); *Drilex Sys. v. Flores,* 1 S.W.3d 112, 117–18 (Tex.1999). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles—in other words, whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 241–42.

### A. Exclusion of DX 982

At trial, Clyde testified on cross-examination that neither she nor Braun ever told anyone who worked at CAS to use an alias when talking to WCPS about computer repairs. Clyde further testified that she did not know that a woman named Paula Pittman worked at WCPS, that CAS's technicians were not authorized to talk to Warrantech, and that she was not aware of anyone at CAS ever talking to Pittman or doing so using a fake name. To rebut this testimony, the Warrantech Parties sought to admit into evidence Clyde's letter to her attorney, which read in pertinent part:

> Paula Pittman is in Resolutions at Warrantech. When she first phoned, we were not prepared and we asked a tech to speak with her. Both our manager and I know her. The tech used to work at Warrantech also so did not give his real name. She asked for the information on this repair order and also asked who our lawyer was.
>
> We phoned her back and asked her to fax us in writing as we had not dealt with her before. She asked who the President and owner and manager of the Warrantech account were. We did not give names.

Appellees' attorney objected to admission of Clyde's letter based on the attorney-client privilege, and the trial court excluded it on that basis. The Warrantech Parties contend that this ruling was erroneous because Clyde and CAS had waived the attorney-client privilege with respect to the letter and the offensive use and crime/fraud exceptions to this privilege apply.

### 1. Waiver of Attorney–Client Privilege

The Warrantech Parties contend that Clyde and CAS waived their claim of privilege with respect to Clyde's letter by producing it as part of DX 982, by failing to assert the privilege for three years after its production, and by failing to assert the privilege within ten days after the Warrantech Parties listed DX 982 on their trial exhibits list.

▮▮▮ A party who produces material or information without intending to waive a claim of privilege does not waive that claim if—within ten days or a shorter time ordered by the court, after the producing party actually discovers that the production was made—the producing party amends the response, identifying the material or information produced and stating the privilege asserted. Tex.R. Civ. P. 193.3(d). The focus of Rule 193.3(d) is on the intent to waive the privilege, not the

intent to produce the material or information. *Id.* cmt. 4, 977–978 S.W.2d (Tex. Cases) LVI. Therefore, a party who fails to diligently screen documents before producing them does not waive a claim of privilege, and the ten-day period runs from the party's first awareness of the mistake, not from the date of production. *Id.*[4] To avoid complications at trial, however, a party may identify before trial the documents intended to be offered, thereby triggering the obligation to assert any overlooked privilege under this rule. *Id.*

The record in this case shows that Clyde's letter was inadvertently produced to the Warrantech Parties' counsel three years before trial. After production, the Warrantech Parties bates-stamped Clyde's letter as "CAS 00648," apparently because the documents were not bates-stamped when CAS produced them. Meanwhile, CAS bates-stamped a completely different document as 00648.

On their trial exhibits list filed nearly a month before trial, the Warrantech Parties identified DX 982 as "Invoice with attachments"—the identical description given to hundreds of other exhibits, each of which was comprised of an invoice from CAS to WCPS and any related correspondence. The Warrantech Parties' counsel admitted to the trial court that Clyde's letter, which was one of the attachments to the invoice in DX 982, was not further identified or mentioned in that exhibits list. The day before trial, the Warrantech Parties amended their trial exhibits list and, for the first time, identified Clyde's letter as "Letter from Clyde to Cramb."[5] CAS and

Clyde did not, however, discover that production had been made until the Warrantech Parties offered the letter three days later during trial, at which time they immediately asserted the attorney-client privilege with respect to it.

■ "Identify" means "to establish the identity of." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 575 (10th ed.1994). Under the circumstances presented here, the trial court could have reasonably concluded that the Warrantech Parties' original designation of "Invoice with attachments" on their trial exhibits list did not sufficiently establish the identity of Clyde's letter. Although the letter was more clearly identified the day before trial, CAS and Clyde's assertion of the privilege three days later when the letter was offered into evidence was well within Rule 193.3(d)'s ten-day grace period. Therefore, the trial court did not abuse its discretion by ruling that CAS and Clyde had not waived their claim of privilege by failing to timely assert it.

### 2. Offensive Use Exception

■ The Warrantech Parties also assert that CAS and Clyde waived the attorney-client privilege by offensive use. Under the offensive use doctrine, the attorney-client privilege may be waived if the party asserting the privilege uses it as a sword rather than a shield. *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex.1993) (orig.proceeding). To determine whether a waiver has occurred due to offensive use, the trial court considers three factors:

---

**4.** The Warrantech Parties' reliance on *Granada Corp. v. Honorable First Court of Appeals* as contrary authority is misplaced. *See* 844 S.W.2d 223, 226–27 (Tex.1992) (holding that claim of privilege as to inadvertently produced document was waived where not asserted until eleven months after production).

*Granada Corp.* was overturned by Rule 193.3(d) to the extent the two conflict. TEX.R. CIV. P. 193.3(d) cmt. 4; *see also In re Carbo Ceramics Inc.*, 81 S.W.3d 369, 376 (Tex.App.-Houston [14th Dist.] 2002, orig. proceeding).

**5.** G. Stanley Cramb was Clyde's attorney.

•whether the party asserting the attorney-client privilege is seeking affirmative relief;

•whether the privileged information sought is such that, if believed by the fact finder, in all probability it would be outcome determinative of the cause of action asserted; and

•whether disclosure of the confidential communication is the only means by which the aggrieved party may obtain the evidence.

*Id.* With regard to the second factor, mere relevance is insufficient; the confidential communication must go to the very heart of the affirmative relief sought. *Id.* Further, if any one of these three requirements is lacking, the trial court must uphold the privilege. *Id.*

In this case, it is undisputed that CAS and Clyde were seeking affirmative relief. The Warrantech Parties assert that the letter was outcome determinative because it showed that Clyde testified falsely about CAS's use of aliases when communicating with WCPS, her acquaintance with Paula Pittman, and whether CAS's technicians were authorized to talk to Warrantech personnel. The Warrantech Parties contend that the letter showed Clyde was not a credible witness and that, if the jury had known about it, they would not have believed any of her other testimony and would not have returned a verdict in appellees' favor.

██ Apart from the letter, however, there was other evidence before the jury that called Clyde's credibility into question and showed that appellees had attempted to withhold CAS's true identity from the Warrantech Parties. For example, Clyde admitted at trial that she had signed Wichers's name on the service provider questionnaire and had denied doing so at her deposition. Clyde also admitted that she had listed Wichers's address and telephone number as being in Hurst, Texas, which was incorrect because he lived in Michigan. In addition, Clyde admitted that she had made hand-written notes on an invoice sent to WCPS, which were signed by someone named "Sue"—although she denied knowing who "Sue" was.

Although Clyde had stated on CAS's service provider questionnaire that Wichers was CAS's manager, Wichers testified that he had never managed CAS and had been to its Texas office only on one brief occasion when Braun wanted to show it to him. The jury also learned that someone at CAS had sent numerous emails from Kevin "Wickers" to various people at WCPS, even though Wichers had not authorized the emails. The same misspelling of Wichers's name appeared on both the emails and CAS's service provider questionnaire that Clyde admitted signing.

Cheryl Schupbach testified that CAS hired her because no one at WCPS knew her and she could talk to WCPS on CAS's behalf without tipping off WCPS employees. Schupbach further testified that Braun had instructed her and others to use fake names in their communications with WCPS. Schupbach also testified that Braun told her he was attempting to keep CAS's existence a secret from WCPS, at least until November 1998.

Melinda Bratton, who had moonlighted briefly as a technician at CAS while working for Warrantech, testified that she had used an alias when contacting Warrantech on CAS's behalf. Bratton testified that two of CAS's other technicians told her to use an alias so that Warrantech would not associate her with CAS. Bratton further testified that CAS's technicians wrote their aliases and real names on a chalk board in their work area at CAS.

In light of this other evidence, we hold that Clyde's letter was not outcome deter-

minative of either appellees' or the Warrantech Parties' claims. Therefore, the trial court did not abuse its discretion by refusing to apply the offensive use exception.

### 3. Crime/Fraud Exception

The Warrantech Parties assert that Clyde's letter was admissible under the crime/fraud exception to the attorney-client privilege because her attorney had a duty to disclose its existence in order to prevent her from working a fraud upon the court with her false testimony. The Warrantech Parties further assert that the letter should have been admitted because, although CAS's and Clyde's use of aliases when dealing with WCPS was not in itself actionable, the use of the fake names "tend[ed] to support" their fraud claims against appellees.

■■■■■ A client has the privilege to refuse to disclose and to prevent another person from disclosing confidential communications between herself and her lawyer made for the purpose of facilitating the rendition of professional legal services to the client. TEX.R. EVID. 503(b)(1)(C). The attorney-client privilege does not apply, however, if the lawyer's services were sought to enable anyone to commit what the client knew or reasonably should have known to be a crime or fraud. TEX.R. EVID. 503(d)(1). The crime/fraud exception applies only if (1) the party asserting it makes out a prima facie case of *contemplated* fraud and (2) there is a relationship between the *document for which the privilege is challenged* and the prima facie proof offered. *Granada Corp.*, 844 S.W.2d at 227; *Kugle v. DaimlerChrysler Corp.*,

88 S.W.3d 355, 362–63 (Tex.App.-San Antonio 2002, pet. denied) (en banc op. on reh'g). The fraud must have been ongoing or about to be committed when the document was prepared. *In re Monsanto Co.*, 998 S.W.2d 917, 933–34 (Tex.App.-Waco 1999, orig. proceeding); *Freeman v. Bianchi*, 820 S.W.2d 853, 861–62 (Tex.App.-Houston [1st Dist.] 1991, orig. proceeding).

■■■■■ The Warrantech Parties made no showing that Clyde contemplated committing a fraud upon the court when she wrote her letter. The letter was written in December 1998, more than two months before suit was filed and several years before the case went to trial. The Warrantech Parties assert, however, that Clyde's attorney had the duty to disclose the letter's existence to prevent her from working a fraud upon the court with her false testimony that was contrary to the letter. This argument is premised on section 3.03(a) of the Texas Disciplinary Rules, which prohibits a lawyer from knowingly offering or using false evidence or knowingly failing to disclose a fact to a tribunal when disclosure is necessary to avoid assisting in a fraudulent act. TEX. DISCIPLINARY R. PROF'L CONDUCT § 3.03(a)(2), (5), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9); *see also Volcanic Gardens Mgmt. Co. v. Paxson*, 847 S.W.2d 343, 347–48 (Tex.App.-El Paso 1993, orig. proceeding) (holding that attorney-client privilege does not prevent attorney from making disclosures of intended fraud required or allowed by disciplinary rules). Section 3.03(a) is inapplicable here because it only addresses an attorney's duties;[6] it does not address the

---

**6.** Appellees' counsel did not, as the Warrantech Parties contend, violate these duties. He did not offer Clyde's testimony; it came in on cross-examination. Further, he did not improperly fail to disclose any facts to the trial

court because there is no evidence that he remembered the letter's existence, or knew that it would contradict Clyde's testimony on cross-examination, until both were offered at trial.

admissibility of evidence.[7]

Further, although the letter is evidence that Clyde and CAS were attempting to conceal CAS's true identity, it does not show that they were contemplating or engaged in ongoing fraud as alleged by the Warrantech Parties. The Warrantech Parties' fraud claims were that appellees fraudulently induced WCPS to enter the service provider agreement by concealing CAS's identity and then used insider information to charge WCPS for repairs that CAS did not make and repair parts that CAS did not buy. Clyde's letter is not evidence that she was contemplating fraudulently inducing WCPS to enter the service provider agreement because it was written in December 1998, several months after the agreement had been entered.

In addition, nothing in the letter or the rest of DX 982 indicates that CAS's use of aliases was due to the fact that it was charging or intended to charge WCPS for nonexistent repairs or parts. To the contrary, DX 982 pertained to a computer that CAS believed could not be repaired under warranty because it had been damaged due to customer abuse. CAS communicated this information to WCPS and also estimated, in response to WCPS's inquiry, that the computer could be repaired for $900. Clyde's letter tells her attorney that the repairs were never made because

WCPS did not approve them and that the computer owner was going to sue as a result. Thus, neither Clyde's letter nor the use of fake names is evidence of an ongoing or contemplated fraud at the time the letter was written, and the trial court did not abuse its discretion by concluding that the crime/fraud exception did not apply to DX 982.

■■■■ Despite the fact that Clyde's letter does not fall within the crime/fraud exception, the Warrantech Parties assert that they are entitled to a new trial because appellees procured their favorable judgment with Clyde's perjury, which the Warrantech Parties were precluded from revealing to the jury. A judgment is not procured by perjury unless the perjury prevented the injured party from fully presenting its case at trial or resulted in the court or jury being deceived as to a material issue. *McMurry v. McMurry,* 67 Tex. 665, 4 S.W. 357, 360 (1887); *Pinkston v. Pinkston,* 266 S.W.2d 515, 519 (Tex.Civ. App.-Waco 1954, writ ref'd n.r.e.).[8] Assuming for argument's sake that Clyde's credibility was a material issue, there was, as we have discussed, ample other evidence before the jury that her testimony was untruthful, including: her admission that she had lied about signing Wichers's name—misspelled as "Wickers"—on CAS's service provider questionnaire and provid-

---

7. The cases on which the Warrantech Parties rely are also inapposite because they involved situations in which the attorney-client communications themselves showed an intent to commit a fraud upon the court. *See Helton v. State,* 670 S.W.2d 644, 646 (Tex.Crim.App. 1984) (where client had told attorney of defense witness's intent to perjure herself at trial); *Volcanic Gardens Mgmt. Co.,* 847 S.W.2d at 348 (where client had told attorney of intent to file fraudulent lawsuit). Clyde's letter, by itself, shows no such intent.

8. The Warrantech Parties also rely on several cases that involved new trial requests based

on newly discovered evidence that the judgments at issue were procured by perjury. *See McMurry,* 4 S.W. at 358; *Steed v. Winder,* 130 S.W.2d 403, 404-05 (Tex.Civ.App.-Galveston 1939, no writ); *Dixie Gas & Fuel Co. v. Jacobs,* 47 S.W.2d 457, 461-62 (Tex.Civ.App.-Beaumont 1932, writ dism'd w.o.j.); *see also* Tex.R. Civ. P. 324(b)(1) (providing for new trial based on newly discovered evidence). These cases have no application here because neither Clyde's letter nor the fact that it was inconsistent with her trial testimony was discovered after trial.

ing false information about his address and phone number; her admission that she had made hand-written notes on an invoice to WCPS that was signed by "Sue," but no one named Sue worked for CAS; evidence that someone at CAS had sent WCPS numerous emails from Kevin "Wickers"; and testimony from former CAS employees that they had been instructed to use— and had used—aliases in their dealings with WCPS. Thus, Clyde's apparently false testimony did not prevent the Warrantech Parties from fully presenting their case at trial or result in the jury being deceived as to a material issue.[9]

 The Warrantech Parties' real complaint is that they should have been allowed to impeach Clyde with her letter and that, if they had, the entire outcome of the trial would have been different because Clyde's obvious lack of credibility would have caused the jury to find against appellees and in favor of the Warrantech Parties. In light of all the evidence before the jury, however, we conclude that, even if the trial court had abused its discretion by excluding Clyde's letter, it is not probable that a different ruling would have caused the result asserted by the Warrantech Parties. *See* TEX.R.APP. P. 44.1(a)(1). Accordingly, for all of the reasons we have discussed, we overrule the Warrantech Parties' first issue.

## B. Admission of "Bad Character" Evidence

 In their second issue, the Warrantech Parties complain that the trial court reversibly erred by allowing the president of a service provider unrelated to CAS to testify—in violation of the court's prior limine ruling—that Warrantech had an across-the-board policy of refusing to pay 15–20% of its service providers' invoices, regardless of their merit. This complaint is waived because the Warrantech Parties' general statement of "objection" when the testimony was offered, followed by an off-the-record bench conference, did not create a record sufficient to preserve the complaint for our review. *See* TEX.R.APP. P. 33.1(a) (requiring timely, specific objection and ruling on record to preserve complaint for appellate review); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 637 (Tex.1986) (op. on reh'g) (holding that timely, specific objection is necessary to preserve error regarding question asked in contravention of sustained motion in limine). We overrule the Warrantech Parties' second issue.

## V. Discovery Abuse

In their third issue, the Warrantech Parties contend that the trial court abused its discretion by denying their motion for new trial because CAS withheld a "critical piece of evidence" during discovery—a check that it had given to Dill. The Warrantech Parties assert that their first knowledge of the withheld check came during Clyde's trial testimony. They further assert that this discovery abuse prejudiced them because the check tended to prove their claim that appellees were pay-

---

9. We decline the Warrantech Parties' invitation to apply the Texas Penal Code's definition of what constitutes a material statement for purposes of a criminal perjury conviction to our determination of whether Clyde's apparently false testimony was sufficiently material to warrant a new trial. The penal code definition does not pertain to civil proceedings, nor does it govern the admissibility of evidence. *See* TEX. PENAL CODE ANN. § 37.04(a) (Vernon 2003) (providing that statement is sufficiently "material" to sustain aggravated perjury conviction if it could have affected the course or outcome of an official proceeding, regardless of statement's admissibility under rules of evidence); *Ly v. State*, 931 S.W.2d 22, 24 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (explaining that aggravated perjury test for materiality should not be mistaken as an evidentiary rule).

ing Dill to send them WCPS's computer repair business.

During discovery, the Warrantech Parties asked appellees to produce all documents that reflected payments from any of them to Dill. Appellees responded that they had no documents responsive to this request. At trial, Clyde testified that no one, including Dill, had ever asked her or CAS for payment in exchange for Warrantech's business or for approving CAS as a vendor. Dill also testified that he had never received any compensation from CAS.

During a deposition given about three weeks before trial, however, Clyde admitted that she had written Dill a check from her NationsBank company account for just under $4,000 to get computer repair business from a manufacturer known as Proteva. Clyde made the same admission during cross-examination at trial. She testified that she made this payment to Dill after he had stopped working for Warrantech and had become a consultant for Proteva. She admitted that she had never given the Warrantech Parties a copy of the check.

Both Dill and Dwight Wayne Rogers, Jr., one of Warrantech's and CAS's former technicians, testified that Dill had worked for Proteva as a consultant or independent broker for several months after his employment with Warrantech was terminated in late October 1998. Rogers also testified that, in early December 1998, CAS paid Dill $3,500 plus expenses to broker a laptop service repair contract between CAS and Proteva. According to Rogers, Clyde authorized the payment and wrote the check, but he actually discussed the brokerage arrangement with Dill and delivered the check on CAS's behalf.

Contrary to much of this testimony, Mindy Bratton testified that, during the two weeks in which she worked for CAS in September 1998, she heard James Schupbach and Rogers discuss how they needed to repair as many units for WCPS as possible because Dill would get a "kickback" for each unit. Bratton further testified that Dill once came to CAS's offices— apparently when Clyde was not there— laughing and talking about how he needed to pick up his money from Clyde. Bratton admitted, however, that she never actually saw anyone pay Dill any money, and she did not know whether he received any.

During closing argument, appellees' attorney argued to the jury:

> Miss Bratton testified that, well, I heard Matt Dill come in when Lou Braun and Victoria Clyde weren't there and said, Where's Victoria? I want my check. So, what check? What payment?
>
> You know, they say that Matt Dill was demanding bribes, they say Matt Dill was taking kickbacks, they say Matt Dill was getting paid for every repair order that went to Warrantech. They've got no evidence that Matt Dill was paid anything other than surmise and speculation. They've shown you no evidence of any payment to anybody.

The Warrantech Parties did not object to this argument.

As this record shows, Clyde first informed the Warrantech Parties of the check to Dill at her deposition three weeks before trial. The Warrantech Parties' attorney acknowledged this undisputed fact on the record when Clyde made the same admission during her trial testimony. He suggested that Clyde's admission had been induced by his predisposition subpoena of her bank records. Despite this admitted pretrial knowledge, the Warrantech Parties do not direct us to any place in the record—apart from their motion for new trial—where they lodged an objection or sought any relief from the trial court

based on the discovery abuse. While we do not condone the failure to produce the check, the trial court could have reasonably concluded the check was not a "critical piece of evidence" or that the Warrantech Parties' failure to offer documentary evidence of kickbacks at trial was not, as they contend, due to CAS's discovery abuse. Accordingly, we hold that the trial court did not abuse its discretion by denying the Warrantech Parties' motion for new trial.[10] See *Strackbein v. Prewitt,* 671 S.W.2d 37, 38 (Tex.1984); *Pabich v. Kellar,* 71 S.W.3d 500, 510 (Tex.App.-Fort Worth 2002, pet.denied) (op. on reh'g) (both applying abuse of discretion standard of review to trial court's ruling on motion for new trial). We overrule the Warrantech Parties' third issue.

## VI. Fiduciary Duty

In their fourth issue, the Warrantech Parties challenge the legal and factual sufficiency of the evidence to support the jury's finding that Braun and Clyde complied with their fiduciary duties to WCPS. They contend that Braun and Clyde breached their fiduciary duties as a matter of law because they began to look for office space for CAS while still employed by Warrantech,[11] but did not disclose this fact or their "involvement" with CAS to WCPS.

The Warrantech Parties carefully point out, however, that they have "never asserted" that Braun and Clyde could not go into business after leaving Warrantech or that they stole WCPS's customers.

The Warrantech Parties cite no legal authority for the proposition that an employee must inform his employer that he is considering starting a business that will not compete with the employer. Therefore, this complaint is waived due to inadequate briefing. See TEX.R.APP. P. 38.1(h) (providing that appellate briefs must contain appropriate citations to legal authorities); *Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994) (noting long-standing rule that point may be waived due to inadequate briefing).[12] Further, Braun, Rogers, and Bratton all testified that Warrantech had no policy against its employees moonlighting for service repair facilities that did business with Warrantech or repairing computers on their own. To the contrary, Braun and Rogers knew several Warrantech employees, including WCPS's president, who either owned companies "on the side" that did work for Warrantech or moonlighted as employees of service providers that performed work for Warrantech. WCPS's president sanctioned the

10. The Warrantech Parties also contend that a new trial is warranted because the quoted jury argument was an assertion that Clyde's check to Dill did not exist or that the Warrantech Parties' failure to offer the check at trial was their fault. This complaint is waived because the Warrantech Parties never objected to the jury argument at trial. See *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839–40 (Tex.1979); *Wells v. HCA Health Servs. of Tex., Inc.,* 806 S.W.2d 850, 854 (Tex.App.-Fort Worth 1990, writ denied) (both setting out steps for preserving complaints of improper jury argument); *see also* TEX.R. CIV. P. 324(b)(5) (providing that complaint of incurable jury argument must be raised in motion for new trial if trial court did not otherwise

rule on complaint). Further, the complaint takes appellees' jury argument out of context.

11. The Warrantech Parties state that Braun and Clyde were employed by WCPS. Braun and Clyde testified that they were employed by Warrantech, but performed work for WCPS.

12. Also waived for the same reason is the Warrantech Parties' unexplained contention that Braun and Clyde breached their fiduciary duty not to use insider information gained through their employment at Warrantech to the Warrantech Parties' detriment by "concoct[ing] a scheme while still employed at WCPS ... to defraud WCPS."

moonlighting and once even instructed Braun not to restructure WCPS's work schedules in a manner that would interfere with its employees' second jobs.

The Warrantech Parties also contend that the severance agreement Braun entered with WCPS in August 1998, which provided that he would not engage in any conduct that would "reflect negatively on or harm the business interest of [WCPS]," obligated him to "refrain from taking any action that might violate a fiduciary duty." This argument is not briefed; moreover, the jury found that Braun did not breach the severance agreement, and the Warrantech Parties do not challenge that finding. We overrule the Warrantech Parties' fourth issue.

## VII. Postjudgment Interest

In their fifth issue, the Warrantech Parties assert that the trial court's judgment should be reformed to reflect a 5% postjudgment interest rate. The trial court's judgment, which was signed on December 6, 2002, provides for a postjudgment interest rate of 10%. The Warrantech Parties filed their notice of appeal on January 3, 2003. In June 2003, the legislature amended Texas Finance Code section 304.003 to reduce the postjudgment interest rate from 10% to 5% per year "if the prime rate as published by the Federal Reserve Bank of New York [on the date of computation] is less than five percent." [13] This amendment applies to a "case in which a final judgment is signed or subject to appeal on or after the effective date of this Act." [14]

The Warrantech Parties contend that because their appeal was pending in this court when the amendment to section 304.003 became effective, the judgment is "subject to appeal on or after the effective date" of the legislation and the new postjudgment interest rate should apply. We recently rejected this construction of this phrase, holding instead that the 5% postjudgment interest rate applies only to cases in which a judgment is signed or becomes capable of being appealed on or after the effective date of amended section 304.003. *Columbia Med. Ctr. v. Bush,* 122 S.W.3d 835, 866 (Tex.App.-Fort Worth 2003, pet. filed). The judgment at issue here was signed and became capable of being appealed months before the effective date of the amendment; therefore, the 5% postjudgment interest rate in amended section 304.003 does not apply. We overrule the Warrantech Parties' fifth issue.

## VIII. Conclusion

Having overruled all of the Warrantech Parties' issues on appeal, we affirm the trial court's judgment.

---

**13.** Acts of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01 & ch. 676, § 1, 2003 Tex. Gen. Laws 847, 862, 2096, 2096–97 (current version at Tex. Fin.Code Ann. § 304.003(c)(2) (Vernon Supp.2004)).

**14.** Tex. Fin.Code Ann. § 304.003 historical & statutory notes; *see also* Acts of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.04 & ch. 676, § 2(a), 2003 Tex. Gen. Laws 847, 862, 2096, 2096–97.