COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-002-CV
  
  
WARRANTECH 
CORPORATION AND                                      APPELLANTS
WARRANTECH 
CONSUMER PRODUCTS
SERVICES, 
INC.
  
V.
   
COMPUTER 
ADAPTERS SERVICES,                                          APPELLEES
INC. 
D/B/A COMPUTER ACCESSORIES
SERVICES, 
LOU BRAUN, AND
VICTORIA 
CLYDE
  
------------
 
FROM 
THE 67TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        Warrantech 
Corporation (Warrantech) and Warrantech Consumer Products Services, Inc. (WCPS) 
(collectively, the Warrantech Parties) appeal from the trial court’s judgment 
in favor of Computer Adapters Services, Inc. d/b/a Computer Accessories Services 
(CAS), Lou Braun, and Victoria Clyde. The primary issue we must decide is 
whether the trial court abused its discretion by excluding, based on the 
attorney-client privilege, a letter from Clyde to her attorney that showed some 
of Clyde’s trial testimony to be false. Because we conclude that the trial 
court did not abuse its discretion by excluding the letter and that the ruling, 
even if erroneous, would not have caused the rendition of an improper judgment, 
and because the Warrantech Parties do not prevail on their remaining appellate 
issues, we will affirm.
II. Background Facts and Procedural History
        Warrantech 
provides service contracts to businesses that sell computers and related 
equipment. Pursuant to these contracts, product purchasers may obtain warranty 
services in the event they encounter problems with the products. Warrantech 
provides its service contract services via Warrantech Help Desk, Inc./WCPS.[1]  Thus, if a customer has a problem with a computer 
and calls the number provided on the service contract, the customer will reach 
WCPS.  WCPS attempts to diagnose and solve the problem over the phone, but 
if that proves unsuccessful, WCPS refers the customer to a repair company, which 
performs repair services on the computer and bills WCPS for the work.  
During the time when most of the events relevant to this case occurred, WCPS 
used hundreds of repair companies.
        Braun 
and Clyde are husband and wife. From April through August 1997, Braun, and 
occasionally Clyde, performed consulting work for Warrantech on a contract 
basis. In 1997, Warrantech hired Braun as a full-time employee, as Vice 
President of Operations for WCPS. Braun and Clyde were living in Michigan at the 
time, but they moved to Texas so Braun could take the job. Clyde continued to do 
contract work as a consultant for Warrantech in its claims department. From 
August 1997 through early 1998, Warrantech paid Clyde’s consulting fees to a 
company she had formed while still in Michigan. Sometime in 1998, however, Clyde 
began billing Warrantech for her time through the contracting company that 
Warrantech used. Clyde took the contract position only temporarily, until she 
could find something else to do.
        Braun 
was employed as Vice President of Operations for WCPS from August 1997 until 
August 1998. In that capacity, Braun became intimately familiar with, among 
other things, how WCPS selected repair companies to use for the services it 
provided and how WCPS processed repair companies’ claims for payment. Braun 
also played a role in selecting which companies WCPS chose to use as repair 
service providers.  In addition, Braun became aware of Warrantech’s 
conflict of interest policy, which provided that no Warrantech employee could 
have an interest in a competitor or supplier without Warrantech’s approval.[2]  He also learned, however, that several Warrantech 
employees, including WCPS’s president, Judy Thomas, owned companies “on the 
side” that did work for Warrantech and that Warrantech employees moonlighted 
as employees of service providers that performed service repairs for Warrantech.
        In 
her contract consultant capacity in WCPS’s claims department, Clyde also 
became intimately familiar with how WCPS processed and paid service providers’ 
requests for payment for both parts and labor.  She continued, however, to 
look for something else to do on a part-time basis.  She had inherited some 
money that she wanted to invest in opening a business, but while she worked for 
Warrantech, those plans “went on hold.”
        In 
May 1998, Warrantech hired Mato Dill as WCPS’s Vice President of Services. 
Braun and Dill knew each other because, in the 1980s, they had both worked for a 
company known as Highland Super Stores. Braun also knew Judy Thomas from his 
days as a Highland employee.  Thomas assigned Dill some of Braun’s 
responsibilities, such as selecting which companies WCPS would use as repair 
service providers.
        On 
August 13, 1998, Warrantech laid off Braun and terminated Clyde’s consulting 
contract. That same day, Braun signed a severance agreement that contained 
confidentiality and noncompete provisions, for which he was paid $22,500. The 
agreement provided that, for the three-month period ending November 18, 1998, 
Braun would not own, operate, direct, invest in, or accept managerial employment 
from any entity that (1) competed with Warrantech or (2) solicited any of 
Warrantech’s customers.
        Sometime 
between August 14 and August 18, 1998, CAS was formed and began soliciting 
WCPS’s computer repair business. Clyde was CAS’s owner and president. She 
testified that starting CAS was solely her idea, formed the day after she and 
Braun were laid off from Warrantech. There is other evidence, however, that 
Braun, Clyde, Dill, and a Warrantech employee named James Schupbach had begun as 
early as June 1998 to discuss starting a company like CAS.
        Throughout 
most of CAS’s relationship with WCPS, Clyde, Braun, and some of CAS’s 
employees attempted to conceal CAS’s identity.  For example, as we 
discuss in greater detail in section IV, CAS’s employees used aliases in their 
communications with WCPS.  In addition, WCPS required potential repair 
companies to fill out a service provider questionnaire that provided information 
about the repair company, including its responsible party or officer.  The 
service provider questionnaire that CAS submitted to WCPS listed Kevin Wichers, 
Braun’s son-in-law, as CAS’s responsible party or officer and gave his 
address as being in Hurst, Texas. Wichers lived in Michigan, however, and he had 
no actual involvement in CAS’s operations. Clyde or Braun had merely discussed 
with Wichers the possibility of him eventually managing one of CAS’s branches, 
and Wichers had authorized the use of his name on service provider applications.
        In 
late August 1998, WCPS approved CAS as a service repair provider and began 
sending CAS work. At that time, Dill was still actively involved, as WCPS’s 
Vice President of Services, in selecting its repair service providers.  He 
instructed WCPS employees to send CAS repair business. During the next few 
months, CAS submitted, and WCPS paid, $360,000 worth of invoices for repair 
services and parts. CAS also submitted $213,000 worth of other invoices for 
repair work and parts that WCPS did not pay.
        Consequently, 
CAS sued the Warrantech Parties for breach of contract, quantum meruit, and 
fraud, alleging that the Warrantech Parties had not paid for many of the repair 
services CAS had rendered and that it was the Warrantech Parties’ common 
practice to defraud repair service providers by issuing repair orders for 
services that were not, or might not be, under warranty and then refusing to pay 
for them.  The Warrantech Parties countersued CAS and named Braun and Clyde 
as third-party defendants, asserting claims for breach of contract, fraud, 
conspiracy, and breach of fiduciary duty. The Warrantech Parties alleged that 
appellees had fraudulently induced them to enter into a service provider 
agreement with CAS by providing false information on their service provider 
questionnaire; had conspired with Dill to defraud the Warrantech Parties by 
using information Braun and Clyde had obtained during their employment with 
Warrantech to form CAS and then submit bills to WCPS for repair services that 
had never been performed; and had bribed Dill and other Warrantech employees to 
send CAS business by paying them “kick-backs.” The Warrantech Parties 
further alleged that CAS had breached the service provider agreement by padding 
its bills and that Braun had breached his severance agreement with Warrantech.
        After 
a jury trial, the jury returned a 10-2 verdict for CAS on its breach of contract 
and quantum meruit claims, against CAS on its fraud claim, and against the 
Warrantech Parties on all of their claims against CAS, Braun, and Clyde. The 
trial court rendered judgment on the verdict and denied the Warrantech 
Parties’ postverdict and postjudgment motions. This appeal followed.
III. Issues on Appeal
        In 
five issues, the Warrantech Parties complain:
•The 
trial court reversibly erred by excluding from evidence defendant’s exhibit 
982 (DX 982), which included a letter from Clyde to her attorney in which she 
admitted CAS had used fake names when communicating with WCPS.
 
•The 
trial court improperly admitted prejudicial and inaccurate character evidence of 
Warrantech’s allegedly fraudulent behavior against entities not involved in 
this case.
 
•The 
trial court erroneously denied the Warrantech Parties a new trial because some 
of Clyde’s trial testimony demonstrated that CAS had committed discovery abuse 
that prejudiced the Warrantech Parties.
 
•The 
evidence is legally and factually insufficient to support the jury’s finding 
that Braun and Clyde fulfilled their fiduciary duties to WCPS.[3]
 
•The 
judgment should be reformed to reflect a lower postjudgment interest rate 
enacted while this appeal was pending.

IV. Trial Court’s Evidentiary Rulings
        In 
their first and second issues, the Warrantech Parties assert that the trial 
court reversibly erred by excluding part of DX 982, a letter from Clyde to her 
attorney that directly contradicted her trial testimony about appellees’ use 
of fake names in their contacts with WCPS, and by admitting “bad character” 
evidence against Warrantech. The Warrantech Parties contend that, because the 
trial turned on the parties’ credibility, these erroneous evidentiary rulings 
probably caused the rendition of an improper judgment and therefore warrant a 
new trial. See Tex. R. App. P. 44.1(a)(1).
        A 
trial court’s rulings admitting or excluding evidence are reviewable under an 
abuse of discretion standard. Nat’l Liab. & Fire Ins. Co. v. Allen, 
15 S.W.3d 525, 527 (Tex. 2000); Drilex Sys. v. Flores, 1 S.W.3d 112, 
117-18 (Tex. 1999). To determine whether a trial court abused its discretion, we 
must decide whether the trial court acted without reference to any guiding rules 
or principles—in other words, whether the act was arbitrary or unreasonable. See 
Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002); Downer 
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. 
denied, 476 U.S. 1159 (1986). Merely because a trial court may decide a 
matter within its discretion in a different manner than an appellate court would 
in a similar circumstance does not demonstrate that an abuse of discretion has 
occurred. Downer, 701 S.W.2d at 241-42.
A. Exclusion of DX 982
        At 
trial, Clyde testified on cross-examination that neither she nor Braun ever told 
anyone who worked at CAS to use an alias when talking to WCPS about computer 
repairs. Clyde further testified that she did not know that a woman named Paula 
Pittman worked at WCPS, that CAS’s technicians were not authorized to talk to 
Warrantech, and that she was not aware of anyone at CAS ever talking to Pittman 
or doing so using a fake name. To rebut this testimony, the Warrantech Parties 
sought to admit into evidence Clyde’s letter to her attorney, which read in 
pertinent part:
 
Paula 
Pittman is in Resolutions at Warrantech. When she first phoned, we were not 
prepared and we asked a tech to speak with her. Both our manager and I know her. 
The tech used to work at Warrantech also so did not give his real name. She 
asked for the information on this repair order and also asked who our lawyer 
was.
 
We 
phoned her back and asked her to fax us in writing as we had not dealt with her 
before. She asked who the President and owner and manager of the Warrantech 
account were. We did not give names.
 
        Appellees’ 
attorney objected to admission of Clyde’s letter based on the attorney-client 
privilege, and the trial court excluded it on that basis. The Warrantech Parties 
contend that this ruling was erroneous because Clyde and CAS had waived the 
attorney-client privilege with respect to the letter and the offensive use and 
crime/fraud exceptions to this privilege apply.
1. Waiver of Attorney-Client Privilege
        The 
Warrantech Parties contend that Clyde and CAS waived their claim of privilege 
with respect to Clyde’s letter by producing it as part of DX 982, by failing 
to assert the privilege for three years after its production, and by failing to 
assert the privilege within ten days after the Warrantech Parties listed DX 982 
on their trial exhibits list.
        A 
party who produces material or information without intending to waive a claim of 
privilege does not waive that claim if—within ten days or a shorter time 
ordered by the court, after the producing party actually discovers that the 
production was made—the producing party amends the response, identifying the 
material or information produced and stating the privilege asserted. Tex. R. Civ. P. 
193.3(d).  The focus of Rule 193.3(d) is on the intent to waive the 
privilege, not the intent to produce the material or information. Id. cmt. 
4, 977-978 S.W.2d (Tex. Cases) LVI. Therefore, a party who fails to diligently 
screen documents before producing them does not waive a claim of privilege, and 
the ten-day period runs from the party’s first awareness of the mistake, not 
from the date of production. Id.[4]  To 
avoid complications at trial, however, a party may identify before trial the 
documents intended to be offered, thereby triggering the obligation to assert 
any overlooked privilege under this rule. Id.
        The 
record in this case shows that Clyde’s letter was inadvertently produced to 
the Warrantech Parties’ counsel three years before trial. After production, 
the Warrantech Parties bates-stamped Clyde’s letter as “CAS 00648,” 
apparently because the documents were not bates-stamped when CAS produced them. 
Meanwhile, CAS bates-stamped a completely different document as 00648.
        On 
their trial exhibits list filed nearly a month before trial, the Warrantech 
Parties identified DX 982 as “Invoice with attachments”—the identical 
description given to hundreds of other exhibits, each of which was comprised of 
an invoice from CAS to WCPS and any related correspondence.  The Warrantech 
Parties’ counsel admitted to the trial court that Clyde’s letter, which was 
one of the attachments to the invoice in DX 982, was not further identified or 
mentioned in that exhibits list.  The day before trial, the Warrantech 
Parties amended their trial exhibits list and, for the first time, identified 
Clyde’s letter as “Letter from Clyde to Cramb.”[5]  
CAS and Clyde did not, however, discover that production had been made until the 
Warrantech Parties offered the letter three days later during trial, at which 
time they immediately asserted the attorney-client privilege with respect to it.
        “Identify” 
means “to establish the identity of.” Merriam 
Webster’s Collegiate Dictionary 575 (10th ed. 1994). Under 
the circumstances presented here, the trial court could have reasonably 
concluded that the Warrantech Parties’ original designation of “Invoice with 
attachments” on their trial exhibits list did not sufficiently establish the 
identity of Clyde’s letter.  Although the letter was more clearly 
identified the day before trial, CAS and Clyde’s assertion of the privilege 
three days later when the letter was offered into evidence was well within Rule 
193.3(d)’s ten-day grace period.  Therefore, the trial court did not 
abuse its discretion by ruling that CAS and Clyde had not waived their claim of 
privilege by failing to timely assert it.
2. Offensive Use Exception
        The 
Warrantech Parties also assert that CAS and Clyde waived the attorney-client 
privilege by offensive use. Under the offensive use doctrine, the 
attorney-client privilege may be waived if the party asserting the privilege 
uses it as a sword rather than a shield. Republic Ins. Co. v. Davis, 856 
S.W.2d 158, 163 (Tex. 1993) (orig. proceeding). To determine whether a waiver 
has occurred due to offensive use, the trial court considers three factors:

•whether 
the party asserting the attorney-client privilege is seeking affirmative relief;
 
•whether 
the privileged information sought is such that, if believed by the fact finder, 
in all probability it would be outcome determinative of the cause of action 
asserted; and
 
•whether 
disclosure of the confidential communication is the only means by which the 
aggrieved party may obtain the evidence.

Id. 
With regard to the second factor, mere relevance is insufficient; the 
confidential communication must go to the very heart of the affirmative relief 
sought. Id. Further, if any one of these three requirements is lacking, 
the trial court must uphold the privilege. Id.
        In 
this case, it is undisputed that CAS and Clyde were seeking affirmative relief. 
The Warrantech Parties assert that the letter was outcome determinative because 
it showed that Clyde testified falsely about CAS’s use of aliases when 
communicating with WCPS, her acquaintance with Paula Pittman, and whether 
CAS’s technicians were authorized to talk to Warrantech personnel. The 
Warrantech Parties contend that the letter showed Clyde was not a credible 
witness and that, if the jury had known about it, they would not have believed 
any of her other testimony and would not have returned a verdict in appellees’ 
favor.
        Apart 
from the letter, however, there was other evidence before the jury that called 
Clyde’s credibility into question and showed that appellees had attempted to 
withhold CAS’s true identity from the Warrantech Parties. For example, Clyde 
admitted at trial that she had signed Wichers’s name on the service provider 
questionnaire and had denied doing so at her deposition. Clyde also admitted 
that she had listed Wichers’s address and telephone number as being in Hurst, 
Texas, which was incorrect because he lived in Michigan. In addition, Clyde 
admitted that she had made hand-written notes on an invoice sent to WCPS, which 
were signed by someone named “Sue”—although she denied knowing who 
“Sue” was.
        Although 
Clyde had stated on CAS’s service provider questionnaire that Wichers was 
CAS’s manager, Wichers testified that he had never managed CAS and had been to 
its Texas office only on one brief occasion when Braun wanted to show it to him. 
The jury also learned that someone at CAS had sent numerous emails from Kevin 
“Wickers” to various people at WCPS, even though Wichers had not authorized 
the emails. The same misspelling of Wichers’s name appeared on both the emails 
and CAS’s service provider questionnaire that Clyde admitted signing.
        Cheryl 
Schupbach testified that CAS hired her because no one at WCPS knew her and she 
could talk to WCPS on CAS’s behalf without tipping off WCPS employees. 
Schupbach further testified that Braun had instructed her and others to use fake 
names in their communications with WCPS. Schupbach also testified that Braun 
told her he was attempting to keep CAS’s existence a secret from WCPS, at 
least until November 1998.
        Melinda 
Bratton, who had moonlighted briefly as a technician at CAS while working for 
Warrantech, testified that she had used an alias when contacting Warrantech on 
CAS’s behalf. Bratton testified that two of CAS’s other technicians told her 
to use an alias so that Warrantech would not associate her with CAS. Bratton 
further testified that CAS’s technicians wrote their aliases and real names on 
a chalk board in their work area at CAS.
        In 
light of this other evidence, we hold that Clyde’s letter was not outcome 
determinative of either appellees’ or the Warrantech Parties’ claims. 
Therefore, the trial court did not abuse its discretion by refusing to apply the 
offensive use exception.
3. Crime/Fraud Exception
        The 
Warrantech Parties assert that Clyde’s letter was admissible under the 
crime/fraud exception to the attorney-client privilege because her attorney had 
a duty to disclose its existence in order to prevent her from working a fraud 
upon the court with her false testimony. The Warrantech Parties further assert 
that the letter should have been admitted because, although CAS’s and 
Clyde’s use of aliases when dealing with WCPS was not in itself actionable, 
the use of the fake names “tend[ed] to support” their fraud claims against 
appellees.
        A 
client has the privilege to refuse to disclose and to prevent another person 
from disclosing confidential communications between herself and her lawyer made 
for the purpose of facilitating the rendition of professional legal services to 
the client.  Tex. R. Evid. 
503(b)(1)(C). The attorney-client privilege does not apply, however, if the 
lawyer’s services were sought to enable anyone to commit what the client knew 
or reasonably should have known to be a crime or fraud. Tex. R. Evid. 503(d)(1). 
The crime/fraud exception applies only if (1) the party asserting it makes out a 
prima facie case of contemplated fraud and (2) there is a relationship 
between the document for which the privilege is challenged and the prima facie 
proof offered. Granada Corp., 844 S.W.2d at 227; Kugle v. 
DaimlerChrysler Corp., 88 S.W.3d 355, 362-63 (Tex. App.—San Antonio 2002, 
pet. denied) (en banc op. on reh’g). The fraud must have been ongoing or about 
to be committed when the document was prepared. In re Monsanto Co., 998 
S.W.2d 917, 933-34 (Tex. App.—Waco 1999, orig. proceeding); Freeman v. 
Bianchi, 820 S.W.2d 853, 861-62 (Tex. App.—Houston [1st Dist.] 
1991, orig. proceeding).
        The 
Warrantech Parties made no showing that Clyde contemplated committing a fraud 
upon the court when she wrote her letter. The letter was written in December 
1998, more than two months before suit was filed and several years before the 
case went to trial. The Warrantech Parties assert, however, that Clyde’s 
attorney had the duty to disclose the letter’s existence to prevent her from 
working a fraud upon the court with her false testimony that was contrary to the 
letter. This argument is premised on section 3.03(a) of the Texas Disciplinary 
Rules, which prohibits a lawyer from knowingly offering or using false evidence 
or knowingly failing to disclose a fact to a tribunal when disclosure is 
necessary to avoid assisting in a fraudulent act. Tex. Disciplinary R. Prof’l Conduct § 3.03(a)(2), (5), reprinted 
in Tex. Gov’t Code Ann. tit. 2, 
subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9); see also Volcanic 
Gardens Mgmt. Co. v. Paxson, 847 S.W.2d 343, 347-48 (Tex. App.—El Paso 
1993, orig. proceeding) (holding that attorney-client privilege does not prevent 
attorney from making disclosures of intended fraud required or allowed by 
disciplinary rules). Section 3.03(a) is inapplicable here because it only 
addresses an attorney’s duties;[6] it does not 
address the admissibility of evidence.[7]
        Further, 
although the letter is evidence that Clyde and CAS were attempting to conceal 
CAS’s true identity, it does not show that they were contemplating or engaged 
in ongoing fraud as alleged by the Warrantech Parties. The Warrantech Parties’ 
fraud claims were that appellees fraudulently induced WCPS to enter the service 
provider agreement by concealing CAS’s identity and then used insider 
information to charge WCPS for repairs that CAS did not make and repair parts 
that CAS did not buy. Clyde’s letter is not evidence that she was 
contemplating fraudulently inducing WCPS to enter the service provider agreement 
because it was written in December 1998, several months after the agreement had 
been entered.
        In 
addition, nothing in the letter or the rest of DX 982 indicates that CAS’s use 
of aliases was due to the fact that it was charging or intended to charge WCPS 
for nonexistent repairs or parts. To the contrary, DX 982 pertained to a 
computer that CAS believed could not be repaired under warranty because it had 
been damaged due to customer abuse. CAS communicated this information to WCPS 
and also estimated, in response to WCPS’s inquiry, that the computer could be 
repaired for $900. Clyde’s letter tells her attorney that the repairs were 
never made because WCPS did not approve them and that the computer owner was 
going to sue as a result. Thus, neither Clyde’s letter nor the use of fake 
names is evidence of an ongoing or contemplated fraud at the time the letter was 
written, and the trial court did not abuse its discretion by concluding that the 
crime/fraud exception did not apply to DX 982.
        Despite 
the fact that Clyde’s letter does not fall within the crime/fraud exception, 
the Warrantech Parties assert that they are entitled to a new trial because 
appellees procured their favorable judgment with Clyde’s perjury, which the 
Warrantech Parties were precluded from revealing to the jury. A judgment is not 
procured by perjury unless the perjury prevented the injured party from fully 
presenting its case at trial or resulted in the court or jury being deceived as 
to a material issue. McMurry v. McMurry, 67 Tex. 665, 4 S.W. 357, 360 
(1887); Pinkston v. Pinkston, 266 S.W.2d 515, 519 (Tex. Civ. App.—Waco 
1954, writ ref’d n.r.e.).[8]  Assuming for 
argument’s sake that Clyde’s credibility was a material issue, there was, as 
we have discussed, ample other evidence before the jury that her testimony was 
untruthful, including: her admission that she had lied about signing Wichers’s 
name—misspelled as “Wickers”—on CAS’s service provider questionnaire 
and providing false information about his address and phone number; her 
admission that she had made hand-written notes on an invoice to WCPS that was 
signed by “Sue,” but no one named Sue worked for CAS; evidence that someone 
at CAS had sent WCPS numerous emails from Kevin “Wickers”; and testimony 
from former CAS employees that they had been instructed to use—and had 
used—aliases in their dealings with WCPS. Thus, Clyde’s apparently false 
testimony did not prevent the Warrantech Parties from fully presenting their 
case at trial or result in the jury being deceived as to a material issue.[9]
        The 
Warrantech Parties’ real complaint is that they should have been allowed to 
impeach Clyde with her letter and that, if they had, the entire outcome of the 
trial would have been different because Clyde’s obvious lack of credibility 
would have caused the jury to find against appellees and in favor of the 
Warrantech Parties. In light of all the evidence before the jury, however, we 
conclude that, even if the trial court had abused its discretion by excluding 
Clyde’s letter, it is not probable that a different ruling would have caused 
the result asserted by the Warrantech Parties. See Tex. R. App. P. 44.1(a)(1). 
Accordingly, for all of the reasons we have discussed, we overrule the 
Warrantech Parties’ first issue.
B. Admission of “Bad Character” Evidence
        In 
their second issue, the Warrantech Parties complain that the trial court 
reversibly erred by allowing the president of a service provider unrelated to 
CAS to testify—in violation of the court’s prior limine ruling—that 
Warrantech had an across-the-board policy of refusing to pay 15-20% of its 
service providers’ invoices, regardless of their merit. This complaint is 
waived because the Warrantech Parties’ general statement of “objection” 
when the testimony was offered, followed by an off-the-record bench conference, 
did not create a record sufficient to preserve the complaint for our review. See 
Tex. R. App. P. 33.1(a) 
(requiring timely, specific objection and ruling on record to preserve complaint 
for appellate review); Pool v. Ford Motor Co., 715 S.W.2d 629, 637 (Tex. 
1986) (op. on reh’g) (holding that timely, specific objection is necessary to 
preserve error regarding question asked in contravention of sustained motion in 
limine). We overrule the Warrantech Parties’ second issue.
V. Discovery Abuse
        In 
their third issue, the Warrantech Parties contend that the trial court abused 
its discretion by denying their motion for new trial because CAS withheld a 
“critical piece of evidence” during discovery—a check that it had given to 
Dill. The Warrantech Parties assert that their first knowledge of the withheld 
check came during Clyde’s trial testimony. They further assert that this 
discovery abuse prejudiced them because the check tended to prove their claim 
that appellees were paying Dill to send them WCPS’s computer repair business.
        During 
discovery, the Warrantech Parties asked appellees to produce all documents that 
reflected payments from any of them to Dill. Appellees responded that they had 
no documents responsive to this request. At trial, Clyde testified that no one, 
including Dill, had ever asked her or CAS for payment in exchange for 
Warrantech’s business or for approving CAS as a vendor. Dill also testified 
that he had never received any compensation from CAS.
        During 
a deposition given about three weeks before trial, however, Clyde admitted that 
she had written Dill a check from her NationsBank company account for just under 
$4,000 to get computer repair business from a manufacturer known as Proteva. 
Clyde made the same admission during cross-examination at trial. She testified 
that she made this payment to Dill after he had stopped working for Warrantech 
and had become a consultant for Proteva. She admitted that she had never given 
the Warrantech Parties a copy of the check.
        Both 
Dill and Dwight Wayne Rogers, Jr., one of Warrantech’s and CAS’s former 
technicians, testified that Dill had worked for Proteva as a consultant or 
independent broker for several months after his employment with Warrantech was 
terminated in late October 1998. Rogers also testified that, in early December 
1998, CAS paid Dill $3,500 plus expenses to broker a laptop service repair 
contract between CAS and Proteva. According to Rogers, Clyde authorized the 
payment and wrote the check, but he actually discussed the brokerage arrangement 
with Dill and delivered the check on CAS’s behalf.
        Contrary 
to much of this testimony, Mindy Bratton testified that, during the two weeks in 
which she worked for CAS in September 1998, she heard James Schupbach and Rogers 
discuss how they needed to repair as many units for WCPS as possible because 
Dill would get a “kickback” for each unit. Bratton further testified that 
Dill once came to CAS’s offices—apparently when Clyde was not 
there—laughing and talking about how he needed to pick up his money from 
Clyde. Bratton admitted, however, that she never actually saw anyone pay Dill 
any money, and she did not know whether he received any.
        During 
closing argument, appellees’ attorney argued to the jury:
   
Miss 
Bratton testified that, well, I heard Matt Dill come in when Lou Braun and 
Victoria Clyde weren’t there and said, Where’s Victoria? I want my check. 
So, what check? What payment?
 
You 
know, they say that Matt Dill was demanding bribes, they say Matt Dill was 
taking kickbacks, they say Matt Dill was getting paid for every repair order 
that went to Warrantech. They’ve got no evidence that Matt Dill was paid 
anything other than surmise and speculation. They’ve shown you no evidence of 
any payment to anybody.

The 
Warrantech Parties did not object to this argument.
        As 
this record shows, Clyde first informed the Warrantech Parties of the check to 
Dill at her deposition three weeks before trial. The Warrantech Parties’ 
attorney acknowledged this undisputed fact on the record when Clyde made the 
same admission during her trial testimony. He suggested that Clyde’s admission 
had been induced by his predeposition subpoena of her bank records. Despite this 
admitted pretrial knowledge, the Warrantech Parties do not direct us to any 
place in the record—apart from their motion for new trial—where they lodged 
an objection or sought any relief from the trial court based on the discovery 
abuse. While we do not condone the failure to produce the check, the trial court 
could have reasonably concluded the check was not a “critical piece of 
evidence” or that the Warrantech Parties’ failure to offer documentary 
evidence of kickbacks at trial was not, as they contend, due to CAS’s 
discovery abuse. Accordingly, we hold that the trial court did not abuse its 
discretion by denying the Warrantech Parties’ motion for new trial.[10]  See Strackbein v. Prewitt, 671 S.W.2d 37, 
38 (Tex. 1984); Pabich v. Kellar, 71 S.W.3d 500, 510 (Tex. App.—Fort 
Worth 2002, pet. denied) (op. on reh’g) (both applying abuse of discretion 
standard of review to trial court’s ruling on motion for new trial). We 
overrule the Warrantech Parties’ third issue.
VI. Fiduciary Duty
        In 
their fourth issue, the Warrantech Parties challenge the legal and factual 
sufficiency of the evidence to support the jury’s finding that Braun and Clyde 
complied with their fiduciary duties to WCPS. They contend that Braun and Clyde 
breached their fiduciary duties as a matter of law because they began to look 
for office space for CAS while still employed by Warrantech,[11] 
but did not disclose this fact or their “involvement” with CAS to WCPS. The 
Warrantech Parties carefully point out, however, that they have “never 
asserted” that Braun and Clyde could not go into business after leaving 
Warrantech or that they stole WCPS’s customers.
        The 
Warrantech Parties cite no legal authority for the proposition that an employee 
must inform his employer that he is considering starting a business that will 
not compete with the employer. Therefore, this complaint is waived due to 
inadequate briefing.  See Tex. R. App. P. 38.1(h) 
(providing that appellate briefs must contain appropriate citations to legal 
authorities); Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 
279, 284 (Tex. 1994) (noting long-standing rule that point may be waived due to 
inadequate briefing).[12]  Further, Braun, 
Rogers, and Bratton all testified that Warrantech had no policy against its 
employees moonlighting for service repair facilities that did business with 
Warrantech or repairing computers on their own.  To the contrary, Braun and 
Rogers knew several Warrantech employees, including WCPS’s president, who 
either owned companies “on the side” that did work for Warrantech or 
moonlighted as employees of service providers that performed work for 
Warrantech. WCPS’s president sanctioned the moonlighting and once even 
instructed Braun not to restructure WCPS’s work schedules in a manner that 
would interfere with its employees’ second jobs.
        The 
Warrantech Parties also contend that the severance agreement Braun entered with 
WCPS in August 1998, which provided that he would not engage in any conduct that 
would “reflect negatively on or harm the business interest of [WCPS],” 
obligated him to “refrain from taking any action that might violate a 
fiduciary duty.”  This argument is not briefed; moreover, the jury found 
that Braun did not breach the severance agreement, and the Warrantech Parties do 
not challenge that finding. We overrule the Warrantech Parties’ fourth issue.
VII. Postjudgment Interest
        In 
their fifth issue, the Warrantech Parties assert that the trial court’s 
judgment should be reformed to reflect a 5% postjudgment interest rate. The 
trial court’s judgment, which was signed on December 6, 2002, provides for a 
postjudgment interest rate of 10%. The Warrantech Parties filed their notice of 
appeal on January 3, 2003.  In June 2003, the legislature amended Texas 
Finance Code section 304.003 to reduce the postjudgment interest rate from 10% 
to 5% per year “if the prime rate as published by the Federal Reserve Bank of 
New York [on the date of computation] is less than five percent.”[13]  This amendment applies to a “case in which a 
final judgment is signed or subject to appeal on or after the effective date of 
this Act.”[14]
        The 
Warrantech Parties contend that because their appeal was pending in this court 
when the amendment to section 304.003 became effective, the judgment is 
“subject to appeal on or after the effective date” of the legislation and 
the new postjudgment interest rate should apply. We recently rejected this 
construction of this phrase, holding instead that the 5% postjudgment interest 
rate applies only to cases in which a judgment is signed or becomes capable of 
being appealed on or after the effective date of amended section 304.003. Columbia 
Med. Ctr. v. Bush, 122 S.W.3d 835, 866 (Tex. App.—Fort Worth 2003, pet. 
filed). The judgment at issue here was signed and became capable of being 
appealed months before the effective date of the amendment; therefore, the 5% 
postjudgment interest rate in amended section 304.003 does not apply. We 
overrule the Warrantech Parties’ fifth issue.
VIII. Conclusion
        Having 
overruled all of the Warrantech Parties’ issues on appeal, we affirm the trial 
court’s judgment.
 
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
PANEL 
A:   CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.
 
DELIVERED: 
April 8, 2004


NOTES
1.  
While the underlying case was pending, Warrantech Help Desk, Inc., a Warrantech 
subsidiary, merged with WCPS, and the parties stipulated that WCPS would be 
liable for any indebtedness that Help Desk owed CAS. Therefore, Help Desk is not 
a party to this appeal. For simplicity, we refer to Help Desk and WCPS 
collectively as WCPS.
2.  
The conflict of interest policy provided:
No 
employee of the Company shall engage in the same or a similar line of business 
or research as that carried on by the Company. An employee shall not have a 
financial interest in a company which is a competitor of or supplier to the 
Company without full disclosure and approval. Financial interests held by 
immediate family members in such companies are to be disclosed to the Company so 
that a determination can be made as to whether a conflict exists. Members of the 
employee’s immediate family include spouse, children, and any other relative 
sharing the same home as the employee.
3.  
Apart from this issue, the Warrantech Parties do not challenge any of the 
jury’s findings on any of the parties’ claims.
4.  
The Warrantech Parties’ reliance on Granada Corp. v. Honorable First Court 
of Appeals as contrary authority is misplaced. See 844 S.W.2d 223, 
226-27 (Tex. 1992) (holding that claim of privilege as to inadvertently produced 
document was waived where not asserted until eleven months after production). Granada 
Corp. was overturned by Rule 193.3(d) to the extent the two conflict. Tex. R. Civ. P. 193.3(d) cmt. 
4; see also In re Carbo Ceramics Inc., 81 S.W.3d 369, 376 (Tex. 
App.—Houston [14th Dist.] 2002, orig. proceeding).
5.  
G. Stanley Cramb was Clyde’s attorney.
6.  
Appellees’ counsel did not, as the Warrantech Parties contend, violate these 
duties. He did not offer Clyde’s testimony; it came in on cross-examination. 
Further, he did not improperly fail to disclose any facts to the trial court 
because there is no evidence that he remembered the letter’s existence, or 
knew that it would contradict Clyde’s testimony on cross-examination, until 
both were offered at trial.
7.  
The cases on which the Warrantech Parties rely are also inapposite because they 
involved situations in which the attorney-client communications themselves 
showed an intent to commit a fraud upon the court. See Helton v. State, 
670 S.W.2d 644, 646 (Tex. Crim. App. 1984) (where client had told attorney of 
defense witness’s intent to perjure herself at trial); Volcanic Gardens 
Mgmt. Co., 847 S.W.2d at 348 (where client had told attorney of intent to 
file fraudulent lawsuit). Clyde’s letter, by itself, shows no such intent.
8.  
The Warrantech Parties also rely on several cases that involved new trial 
requests based on newly discovered evidence that the judgments at issue were 
procured by perjury. See McMurry, 4 S.W. at 358; Steed v. Winder, 
130 S.W.2d 403, 404-05 (Tex. Civ. App.—Galveston 1939, no writ); Dixie Gas 
& Fuel Co. v. Jacobs, 47 S.W.2d 457, 461-62 (Tex. Civ. App.—Beaumont 
1932, writ dism’d w.o.j.); see also Tex. R. Civ. P. 324(b)(1) 
(providing for new trial based on newly discovered evidence). These cases have 
no application here because neither Clyde’s letter nor the fact that it was 
inconsistent with her trial testimony was discovered after trial.
9.  
We decline the Warrantech Parties’ invitation to apply the Texas Penal 
Code’s definition of what constitutes a material statement for purposes of a 
criminal perjury conviction to our determination of whether Clyde’s apparently 
false testimony was sufficiently material to warrant a new trial. The penal code 
definition does not pertain to civil proceedings, nor does it govern the 
admissibility of evidence. See Tex. Penal Code Ann. § 37.04(a) 
(Vernon 2003) (providing that statement is sufficiently “material” to 
sustain aggravated perjury conviction if it could have affected the course or 
outcome of an official proceeding, regardless of statement’s admissibility 
under rules of evidence); Ly v. State, 931 S.W.2d 22, 24 (Tex. 
App.—Houston [1st Dist.] 1996, no pet.) (explaining that aggravated 
perjury test for materiality should not be mistaken as an evidentiary rule).
10.  
The Warrantech Parties also contend that a new trial is warranted because the 
quoted jury argument was an assertion that Clyde’s check to Dill did not exist 
or that the Warrantech Parties’ failure to offer the check at trial was their 
fault. This complaint is waived because the Warrantech Parties never objected to 
the jury argument at trial. See Standard Fire Ins. Co. v. Reese, 584 
S.W.2d 835, 839-40 (Tex. 1979); Wells v. HCA Health Servs. of Tex., Inc., 
806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied) (both setting out 
steps for preserving complaints of improper jury argument); see also Tex. R. Civ. P. 324(b)(5) 
(providing that complaint of incurable jury argument must be raised in motion 
for new trial if trial court did not otherwise rule on complaint). Further, the 
complaint takes appellees’ jury argument out of context.
11.  
The Warrantech Parties state that Braun and Clyde were employed by WCPS. Braun 
and Clyde testified that they were employed by Warrantech, but performed work 
for WCPS.
12.  
Also waived for the same reason is the Warrantech Parties’ unexplained 
contention that Braun and Clyde breached their fiduciary duty not to use insider 
information gained through their employment at Warrantech to the Warrantech 
Parties’ detriment by “concoct[ing] a scheme while still employed at WCPS . 
. . to defraud WCPS.”
13.  
Acts of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01 & ch. 676, § 1, 
2003 Tex. Gen. Laws 847, 862, 2096, 2096-97 (current version at Tex. Fin. Code Ann. § 304.003(c)(2) (Vernon Supp. 
2004)).
14.  
Tex. Fin. Code Ann. § 304.003 historical & 
statutory notes; see also Acts of June 2, 2003, 78th Leg., R.S., ch. 204, 
§ 6.04 & ch. 676, § 2(a), 2003 Tex. Gen. Laws 847, 862, 2096, 2096-97.