

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00311-CV

JEFFREY D. BUSBY, ANDREA BUSBY, AND BUSBY QUARTER HORSE, L.L.C.

APPELLANTS

V.

JOSH HARVEY, DVM, AND OUTLAW EQUINE, L.L.C.

APPELLEES

----------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY
### TRIAL COURT NO. CV14-01-002

----------

## OPINION

----------

The resolution of this appeal hinges on whether a trial court abused its discretion by overruling a motion to disqualify counsel. Appellants Jeffrey D. Busby, Andrea Busby, and Busby Quarter Horse, L.L.C. appeal the trial court's take-nothing judgment in favor of appellees Josh Harvey, DVM (Dr. Harvey) and Outlaw Equine, L.L.C. Because we conclude that the trial court did not abuse its

discretion by denying appellants' motion to disqualify appellees' counsel, we affirm the trial court's judgment.

## Background Facts

Appellants own a barrel-racing horse colloquially known as Daisy. They took Daisy to Dr. Harvey for a routine exam, and he treated Daisy for conditions on her legs. According to appellants, Dr. Harvey's treatment started a course of events that resulted in severe injuries to one of Daisy's legs. Appellants allege that the injuries destroyed Daisy's racing career and significantly reduced her breeding value. Based on these facts, in 2013, appellants brought claims against appellees for negligence, gross negligence, veterinary malpractice, and breach of contract.

Attorney William H. Chamblee appeared in the case to represent appellees. Appellants filed a motion to disqualify Chamblee. In that motion, appellants alleged that before appearing as appellees' counsel, Chamblee had obtained confidential information about the case from appellants. Specifically, appellants contended that when they were in the process of seeking an expert witness to testify in support of their claims, Jeffrey Busby contacted Chamblee, and Busby spoke with Chamblee and exchanged text messages with him. According to appellants, Chamblee recommended a specific expert—Dr. Craig Roberts—to Busby, appellants retained Dr. Roberts, and Chamblee appeared as appellees' counsel weeks later. Through their counsel, appellants then sent a

letter to Chamblee to remind him of Busby's conversations with him and to ask him to withdraw from appellees' representation,[1] but Chamblee refused to do so.

In the motion to disqualify, appellants argued in part,

> While Mr. Busby did not retain Mr. Chamblee as an attorney, Mr. Busby unquestionably shared sensitive information about his case in the course of his conversations with Mr. Chamblee, and relied on Mr. Chamblee's professional advice and services. Mr. Chamblee failed to ever advise [Busby] that he represented [appellees'] insurance company in the course of their conversations or that he might become adverse to [appellants].
>
> . . . .
>
> [Appellants] are now in the untenable position of having shared confidential information with an attorney, only to have that attorney use that information against [appellants]. Worse, [appellants] have designated an expert upon Mr. Chamblee's advice, who Mr. Chamblee used/uses and who will have an unfair advantage in dealing with [appellants'] expert as a result. The timing of Mr. Chamblee's appearance in this case is also particularly troubling to [appellants] mere weeks after [appellants] submitted their expert designations and reports.

In appellees' response to appellants' motion to disqualify, appellees contended in part,

---

[1]Appellants' December 2014 letter to Chamblee stated in part,

> As you may recall, you spoke with my client Mr. Jeff Busby in October 2014 about this case, its facts, and potential experts that could be used. We actually retained the veterinary malpractice expert that you recommended, Dr. Craig Roberts.
>
> . . . Given your conversations regarding this case, its facts, and potential expert witnesses, your representation of [appellees] in this matter would constitute a conflict that [appellants] are unable and unwilling to waive.

3

> [Appellants] have not and will not suffer any prejudice as a result of the retention of defense counsel. Defense counsel has no unfair advantage and is not aware of any of [appellants'] counsel's strategy, work product, or discussions with their clients or experts. [Appellants'] apparent displeasure with [appellees'] retained defense counsel is insufficient to show actual prejudice.

After holding a hearing, without making explicit findings, the trial court denied appellants' motion to disqualify Chamblee.

Following the trial court's decision concerning disqualification, the parties presented evidence and arguments to a jury.[2] The jury found that no negligence of Dr. Harvey proximately caused an injury to Daisy. In accordance with this verdict, the trial court signed a take-nothing judgment on appellants' claims against appellees. Appellants brought this appeal.

## The Trial Court's Decision on Disqualification

In one issue on appeal, appellants contend that the trial court abused its discretion by denying their motion to disqualify Chamblee. They argue that Jeff Busby told Chamblee confidential information about the case and that at trial, Chamblee "repeatedly attacked the expert he recommended . . . based on the confidential information Chamblee previously received from [a]ppellants." Appellees contend that Chamblee's "casual" and non-confidential conversation with Busby that was untethered to the rendition of legal services and concerned only appellants' desire to obtain an expert witness was insufficient to require

---

[2]Appellants nonsuited their breach of contract and gross negligence claims, therefore proceeding to trial on their negligence and veterinary malpractice claims.

4

Chamblee's disqualification after he later became appellees' counsel. Appellees also assert that appellants "suffered no harm from [the trial court's disqualification ruling] when the only harm alleged was [Chamblee's] purported emphasis of the fact that the expert was from Florida—a fact that [a]ppellants' counsel elicited from the expert."

We review a trial court's denial of a motion to disqualify counsel for an abuse of discretion. *See Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994); *Smith v. Abbott*, 311 S.W.3d 62, 73 (Tex. App.—Austin 2010, pet. denied) (op. on reh'g). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Savering v. City of Mansfield*, 505 S.W.3d 33, 39 (Tex. App.—Fort Worth 2016, no pet.) (en banc op. on reh'g). An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports the decision. *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 520 (Tex. App.—Fort Worth 2012, no pet.); *see also Holmes v. GMAC, Inc.*, 458 S.W.3d 85, 96 (Tex. App.—El Paso 2014, no pet.) ("When reviewing a trial court's decision under this standard, we must view the evidence in the light most favorable to the trial court's ruling and indulge every presumption in its favor."); *Pollard v. Merkel*, 114 S.W.3d 695, 697–98 (Tex. App.—Dallas 2003, pet. denied) ("When we consider factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court.").

5

Disqualification of counsel is a severe remedy. *See In re RSR Corp.*, 475 S.W.3d 775, 778 (Tex. 2015) (orig. proceeding). The party moving to disqualify another party's attorney generally bears the burden of proving that the alleged conflict will cause the moving party to suffer actual prejudice. *See In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (op. on reh'g) (explaining that "[e]ven if a lawyer violates a disciplinary rule, the party requesting disqualification must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification"); *In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998) (orig. proceeding); *see also In re Bahn*, 13 S.W.3d 865, 873 (Tex. App.—Fort Worth 2000, orig. proceeding) ("The courts must adhere to an exacting standard when considering motions to disqualify so as to discourage their use as a dilatory trial tactic. In order to prevent such misuse[,] . . . the trial court should require the party seeking disqualification to demonstrate actual prejudice to itself resulting from the opposing lawyer's service . . . ." (citation omitted)).[3] "The movant has the burden of proof on a disqualification motion. To

---

[3]In their opening brief, appellants appeared to recognize the prejudice requirement; they stated in their conclusion that Chamblee should have been "disqualified . . . long before he appeared and prejudiced [a]ppellants before the jury . . . by using the confidential information shared by [Busby]." In their reply brief, appellants recognized that in *Nitla,* the supreme court required a showing of actual prejudice to trigger a trial court's duty to disqualify counsel, and appellants presented argument concerning alleged prejudice. In oral argument, however, appellants argued that they were not required to prove actual prejudice. Based on the decisions cited above, we conclude that appellants were required to show actual prejudice. *See Nitla*, 92 S.W.3d at 422. *But see Hendricks v. Barker*, No. 14-15-00673-CV, 2016 WL 7235459, at *5 (Tex. App.—Houston [14th Dist.] Dec. 13, 2016, no pet.) (stating that some situations concerning an attorney's

prevent the abusive filing of such a motion for tactical reasons, the court must carefully evaluate the motion and record to determine if disqualification is warranted." *In re Tex. Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding) (citation omitted).

At the beginning of the hearing on appellants' disqualification motion, appellants' counsel stated that when Jeff Busby spoke with Chamblee, Busby

> was looking not only to seek legal advice regarding the expert, he was also interested in the possibility of expanding the legal team to include an attorney or attorneys who had . . . local practice experience before the Court.
>
> He spoke with Mr. Chamblee. Mr. Chamblee . . . recommended an expert witness to take on the issues that Mr. Busby discussed with Mr. Chamblee. That expert was retained, and only after that expert was retained and his expert report was filed did we receive a motion to substitute counsel seeing Mr. Chamblee coming in as the counsel for [appellees].
>
> . . . .
>
> . . . [T]he . . . problem, of course, is this sharing of confidential information, relying on it, hiring the expert that was recommended based on the facts given to the counsel only to have that very counsel come in and appear on behalf of [appellees] after the expert report was sent out. Mr. Chamblee represented that this was the expert, quote, we use. He apparently[,] or his firm[,] knows the expert, may have inside information about him. There's a Pandora's box of issues that could come up with defense counsel being on the other side of this particular expert . . . .

---

representation of a party after having represented an adverse party require no showing of prejudice).

7

Also during that hearing, Chamblee told the court about the reason for his contact with Busby.[4]  He explained that he practices equine law and that a mutual friend of his and Busby's referred Busby to him for assistance in locating an expert witness.  Chamblee said that the mutual friend informed him that Busby was already represented and had already filed suit regarding the claim for which he needed an expert.  Concerning the scope of his contact with Busby, Chamblee stated,

> [T]he call went like this -- and I don't think there's any dispute about this.  One, Mr. Busby said, I already have a lawyer.  *Two, I'm not retaining you to be my lawyer.*  Our mutual friend . . . gave me your name because you know horses and you do equine law, and my attorney is having a hard time finding an expert because we cannot find people locally to testify against a local vet.  I said, I don't know the name of anybody off the top of my head.  I'll get in touch with my office, and maybe I can get a name and send you a name.
>
> I sent . . . a copy of my text message back to the gentlemen, Mr. Busby.  The text message says: (Reading) Sorry for delay in getting to you.  My partner, who knew an expert, was out yesterday.  The expert we use is Craig Roberts, DVM, located in Florida.  My partner had the same issue as you not being able to find a local expert to testify against a local DVM.  Dr. Roberts' number is -- and then I give his number and I sign off "good luck."
>
> . . . *That is the extent of our conversation.*  Mr. Busby and I never had another conversation about this.  *I didn't get into the details about his case with him at all.*  He didn't convey to me, this is

---

[4]Chamblee was not under oath at the hearing, but appellants characterize his statements at the hearing as testimony.  An attorney's unsworn statements that are based on personal knowledge and that are on a contested issue have evidentiary value when they are received by a court without objection. *See Mathis v. Lockwood*, 166 S.W.3d 743, 744–45 (Tex. 2005); *Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997).

8

my issue. What's your advice? What do you think? I forgot about the call.

I mean I get a case in December sent to me from [an insurance company]. I run a conflicts check. Mr. Busby doesn't show up anywhere in my conflicts check because he never was my client. . . .

. . . .

So what was conveyed to me in that call from Mr. Busby? Was there any confidential information? The name of an expert in Florida that I don't know and never used but my firm apparently has is not confidential information because the expert is someone that they have now designated and disclosed. If they designated and disclosed him, it was never intended to be confidential, and it's not confidential in the first place. That would be one.

And then the second thing is *there was no other information conveyed by Mr. Busby to me about his case.* Hey, here's what we're thinking. Here's our defense. What do you think? Will this work? Here's what's going on. None of that conversation occurred. This call related to one thing and one thing only: an equine vet friend of his that happens to know me who gave him my name and said, hey, if you can't find an expert, he might be able to give you the name of one. *But that's the totality of it.* [Emphases added.]

Chamblee explained that this case "came to [him] through [an insurance company] a month" after his communication with Busby. He stated that when he received the case, he did not initially remember the call with Busby or make a connection between the case and that call. He explained that he did not initially remember the call because he has "phone conversations about horses every day of [his] life."

9

In response to this explanation from Chamblee, appellants called Busby to testify. Busby testified that he had a more expansive conversation with Chamblee than Chamblee had recalled:

> I discussed details about the case, about the type of lameness issue, how it happened and who the local Defendant was, that I needed -- that I was looking -- that I already had legal counsel but I was looking to add local legal counsel[5] and potentially experts in the equine industry and that I needed a recommendation from somebody of his experience in equine law of an expert to use.
>
> . . . .
>
> [Chamblee] . . . told me he had . . . practiced equine law and his partner had some equine experts that their firm had used and he was on his cell phone so when he got back to his office, he would get me that information. . . .
>
> . . . .
>
> . . . [N]othing . . . was told to me that Mr. Chamblee represented defendants and, in particular, insurance companies as defendants, and specifically this insurance company in the past as a defendant, in equine cases or I would have never told him the details and I would have gone about finding my own expert witness.

On appeal, the parties contest whether the Texas Disciplinary Rules of Professional Conduct or principles derived from those rules required Chamblee's disqualification. *See Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996) (orig. proceeding) ("The Texas Disciplinary Rules of Professional Conduct do not determine whether counsel is disqualified in litigation, but they do provide guidelines and suggest the relevant considerations."). However, under

[5]The trial of this case occurred in Decatur. Appellants' attorneys' office is in Fort Worth. Chamblee's firm's office is in Dallas. Thus, Chamblee would not have been more "local" than the counsel that already represented appellants.

10

the circumstances presented here, we conclude that we need not examine whether the rules or principles flowing from the rules prevented Chamblee's representation.[6] Instead, as appellees argue, we hold that the trial court's denial of appellants' disqualification motion must be upheld based on appellants' failure to sustain their burden of showing actual prejudice from Chamblee's representation. *See Nitla*, 92 S.W.3d at 422; *Meador*, 968 S.W.2d at 350; *Bahn*, 13 S.W.3d at 873.

Any showing of actual prejudice from the trial court's refusal to disqualify Chamblee must flow from a strategic benefit that he received through his communications with Busby and that he later used during his representation of appellees. In contending that Chamblee used the information that Busby had communicated to him to attack Dr. Roberts at trial, appellants contend that Chamblee (1) "repeatedly attacked Dr. Roberts for being from Florida," and (2) questioned how appellants had "found this 'one witness.'" For these assertions, appellants rely on statements that Chamblee made during closing arguments. Appellants contend that Chamblee "proceeded to argue unabashedly in closing how inappropriate it was to have Dr. Roberts testifying in

---

[6]Therefore, our opinion should not be construed as endorsing an attorney's representation of a client under circumstances akin to the facts of this appeal. We note that in fulfilling his or her primary duty to a client, "a lawyer must be ever mindful of the profession's broader duty to the legal system." *In re J.B.K.*, 931 S.W.2d 581, 583 (Tex. App.—El Paso 1996, no writ) (citing Order of The Supreme Court of Texas and The Court of Criminal Appeals, adopting the "*Texas Lawyer's Creed—A Mandate for Professionalism*," Nov. 7, 1989)).

11

this case." They assert that Chamblee attacked Dr. Roberts "as an unscrupulous out-of-towner who 'doesn't really treat horses,' and worked for [a]ppellants because he liked the fees 'he got paid as an expert.'" In summary, appellants argue that Chamblee

> used his *insider knowledge* to subvert the jury's role in fairly weighing the credibility of the experts, and should have been disqualified.
>
> . . . .
>
> By advising a potential client to retain a specific expert, learning *confidential facts* of the case, and then attempting to use those facts and that hiring against the potential client, [Chamblee] stepped over a bright line and should have been disqualified. [Emphasis added.]

Viewing the evidence presented at the disqualification hearing in the light most favorable to the ruling denying disqualification and resolving evidentiary conflicts in a way that supports that ruling, as we must, the evidence shows that Chamblee's communications with Busby narrowly concerned appellants' need to obtain an expert witness, not their desire to obtain additional counsel[7] and not

---

[7]Thus, we disagree with appellants' contention that Busby qualified as Chamblee's "client" under rule of evidence 503(a). *See* Tex. R. Evid. 503(a)(1)(B) (stating that a "client" is a person who "consults a lawyer *with a view to obtaining professional legal services* from the lawyer" (emphasis added)); *see also Mixon v. State*, 224 S.W.3d 206, 209 (Tex. Crim. App. 2007) ("The use of the words 'with a view to obtaining professional legal services' . . . indicates that the protection of the attorney-client privilege is available equally to those persons who had hired the lawyer as well as those . . . *seeking to do so.*" (emphasis added)). Viewed in the light most favorable the trial court's ruling, the evidence also does not support appellants' contention that they sought "legal professional services" from Chamblee.

12

any other factual details or legal or strategic impressions about appellants' case. Viewed in that light, the evidence further shows that the scope of the communications about appellants' need to obtain an expert witnesses included only two components: (1) appellants had been unable to obtain a local expert witness; and (2) Chamblee's partner, who had also had difficulties in obtaining a local expert witness in equine litigation, knew of and had used a Florida expert witness, Dr. Roberts.

The record from the trial does not establish that on any occasion, Chamblee referred to or otherwise used the information about appellants' difficulty in obtaining a local expert witness.[8] *Cf. In re N.P.H.*, No. 09-15-00010-CV, 2016 WL 5234599, at *8 (Tex. App.—Beaumont Sept. 22, 2016, no pet.) (mem. op.) (reviewing an attorney's conduct at trial to determine whether parties seeking disqualification of the attorney before trial were actually prejudiced by the attorney's representation of another party); *In re Duke*, No. 09-16-00185-CV, 2016 WL 4040128, at *2 (Tex. App.—Beaumont July 28, 2016, orig. proceeding [mand. denied]) (mem. op.) ("In this case, William failed to meet his burden to show that actual prejudice existed, as the record contains no evidence to show that Shipley acquired any confidential information about the Dukes' case from her conversation with Rhodes."). Chamblee's cross-examination of Dr. Roberts

---

[8]During oral argument in this appeal, appellants' counsel contended that appellants' trouble in finding a local expert witness was a "confidential, privileged piece of information" and was the "critical piece of data" that Busby disclosed to Chamblee.

focused on, among other matters, the facts of Dr. Harvey's treatment, Dr. Roberts's opinions about that treatment, and discrepancies between those opinions as expressed at trial and what Dr. Roberts had written in his report. Chamblee did refer during closing argument to the immutable, public fact that Dr. Roberts provided veterinary care in Florida (as contrasted with appellees' local expert witness),[9] but that fact was first elicited by appellants during their questioning of Dr. Roberts. In response to appellants' questions, Dr. Roberts

---

[9]Chamblee briefly referred to Dr. Roberts's veterinary practice in Florida as part of a larger critique of his expert qualifications:

> They have a case of medical negligence that they brought against Dr. Harvey, and they brought y'all one witness to try to prove that case, a Dr. Roberts out of Florida. That's who they brought you. Y'all don't practice veterinary medicine. I don't practice veterinary medicine, so you ought to evaluate Dr. Harvey's credibility and who he was on the stand. And you also have to evaluate who they brought you. He hasn't practiced in a hospital setting, in the clinic setting in -- what was it -- 13, 14 years? He does pre-purchase exams, which is going out before someone buys a horse and just doing some general things and saying it's sound, not sound, collecting the money, and going on down the road to the next one. He said he does lameness exams, too, but he doesn't treat them in any hospital setting.
>
> . . . .
>
> Now, maybe Roberts down in Florida running around doing pre-purchase exams for the last 13 years -- he isn't really treating horses. Maybe he ain't using it or maybe he doesn't like it or maybe he just likes the 15 to $17,000 he got paid as an expert. I don't know his motive for what he did. I can guess at his motives, but I don't know. But I know what he told y'all, and I know that you good folks [are] evaluating him and evaluating that gentleman sitting right out there. I truly believe that you folks can tell truth from jibber-jabber.

14

described his Florida residency and his current Florida equine veterinary practice. As appellees contend, appellants elicited from their expert that he was not local, and that appellees later highlighted that fact is not a surprise or prejudice.

Next, appellants emphasize on appeal that Chamblee criticized Dr. Roberts concerning the amount of fees that he had charged. But appellants have not directed us to any part of the record establishing that Chamblee and Busby's pretrial conversation had anything to do with fees or that Chamblee learned something about fees in that conversation that he later used at trial. Similarly, appellants do not direct us to any evidence proving that the other grounds upon which Chamblee criticized Dr. Roberts at trial—either through cross-examination or in the closing argument—had anything to do with the contents of his pretrial conversation with Busby or that he would not have made those criticisms without speaking to Busby.[10] Thus, we reject appellants' argument that Chamblee used "insider knowledge" or employed "confidential facts" to "subvert the jury's role in fairly weighing the credibility of the experts."

Appellants rely on a decision from another court of appeals to contend that Chamblee's disqualification in this case was mandatory. *See Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295 (Tex. App.—Dallas 1988, no writ).

---

[10]At trial, appellants did not object to Dr. Roberts's testimony or to Chamblee's closing argument on the basis that the testimony or argument regarded matters that Busby had confidentially disclosed to Chamblee.

15

In that case, an attorney had worked for a law firm that represented the plaintiff in a wrongful death suit and had participated in confidential discussions concerning litigation strategy and the potential for settlement negotiations before becoming employed by the law firm that represented the defendant in the same suit. *Id.* at 296. The court of appeals held that despite attempts at the defendant's law firm to use a "Chinese wall" to shield the attorney from matters related to the wrongful death case, disciplinary rules required the defendant's firm's disqualification. *Id.* at 300–01. The court reasoned that when

> an attorney in private practice has actual knowledge of the confidences of a former client in a particular case, and he or she undertakes employment with a law firm representing a party whose interests in that identical case are adverse to that former client, the construction of a Chinese wall does not refute the appearance of professional impropriety—the possible disclosure of the former client's confidences—which is prohibited by . . . the Texas Code of Professional Responsibility.

*Id.* at 301. The facts here are distinguishable because Chamblee never represented appellants and, according to him, was never even prospective counsel for them.

Appellants also contend that the trial court "compounded" the alleged error of denying their motion to disqualify Chamblee by "refusing to allow the jury to learn the real facts of Dr. [Roberts's] retention." The following exchange occurred during appellants' questioning of Dr. Roberts:

> [APPELLANTS' COUNSEL:] You were asked about your experience as a veterinarian testifying expert and whether you testified in Texas before --

16

*A.* Yes.

*Q.* -- and what your payments -- what your payments were and all that kind of stuff.  Do you know how we found you as an expert?

*A.* I believe it's because I was working for the [appellees'] counsel --

*MR. CHAMBLEE:* Whoa, whoa.  Your Honor -- he didn't ever work for you.  What are you about to say?  Let's -- let's approach.

*. . . .*

*(At the Bench, off the record)*

*THE COURT:* Thank you, gentlemen.

*Q. (BY [APPELLANTS' COUNSEL])* Let me narrow my question a little bit.  Have you worked on both the Plaintiffs' side and the [Defendants'] side in your -- in your work as a veterinary expert?

*A.* Yes.

To the extent that appellants seek reversal because they should have been allowed to inform the jury that Chamblee had referred Dr. Roberts to them, we disagree for two reasons.  First, because the trial court never sustained an objection to Dr. Roberts's statement that he had "work[ed] for [appellees'] counsel" or instructed the jury to disregard that statement, that evidence remained for the jury to consider for all purposes.  *See In re Bent*, 487 S.W.3d 170, 182 (Tex. 2016) (orig. proceeding).  Second, to the extent that appellants argue that the trial court should have allowed them to develop Dr. Roberts's testimony on that matter further, the record does not contain a specific request or objection that was sufficient to preserve error or a ruling on any such request or

objection. *See* Tex. R. App. P. 33.1(a); *Warrantech Corp. v. Comput. Adapters Servs., Inc.*, 134 S.W.3d 516, 529 (Tex. App.—Fort Worth 2004, no pet.) ("[T]his complaint is waived because the . . . general statement of 'objection' when the testimony was offered, followed by an off-the-record bench conference, did not create a record sufficient to preserve the complaint for our review.").

Finally, we reject appellants' characterizations of Chamblee as having "recommend[ed]" Dr. Roberts as "the exact expert for this exact case" or as having been "unfairly in the unique position of choosing both [parties'] experts." Chamblee stated during the hearing on appellants' disqualification motion that he did not personally know Dr. Roberts and that he had merely told Busby that Chamblee's firm had previously used Dr. Roberts. Nothing in Chamblee's statements indicates that he "chose" Dr. Roberts as appellants' expert or warranted to appellants that Dr. Roberts would be an appropriate expert to testify about the facts and legal theories involved in this case. The record does not indicate what investigation or evaluation appellants conducted concerning Dr. Roberts after the conversation between Chamblee and Busby and before designating him as their expert and eliciting his testimony at trial.

In summary, when viewed in the light most favorable to the trial court's ruling denying disqualification, the record does not disclose any strategic or tactical advantage that Chamblee received and used based on his limited communication with Busby. Thus, we conclude that the trial court did not abuse its discretion by denying appellants' motion to disqualify Chamblee because

18

appellants failed to establish that allowing Chamblee to represent appellees would cause appellants actual prejudice. *See Nitla*, 92 S.W.3d at 422; *Metro. Life Ins. Co.*, 881 S.W.2d at 321; *Bahn*, 13 S.W.3d at 873. We overrule appellants' sole issue.[11]

## Conclusion

Having overruled appellants' only issue, we affirm the trial court's take-nothing judgment.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and PITTMAN, JJ.

DELIVERED: July 27, 2017

---

[11]We decline to discuss alternative arguments presented by appellees because the resolution of those arguments is not necessary to this appeal's disposition. *See* Tex. R. App. P. 47.1.